STATE

v.

Thomas GERMANE.

No. 2006–169–C.A.

Supreme Court of Rhode Island.

June 2, 2009.

Christopher R. Bush, Department of the Attorney General, for Plaintiff.

John A. MacFadyen, Esq., Providence, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice ROBINSON for the Court.

The appellant, Thomas Germane, appeals from an October 3, 2005 decision of the Superior Court upholding the determination of the Sex Offender Board of Review (board of review or board) that the appellant should be classified as a Risk Level III offender[1] for purposes of community notification pursuant to G.L.1956 chapter 37.1 of title 11 (entitled "Sexual Offender Registration and Community Notification Act").

On appeal, Mr. Germane contends that his classification pursuant to the sex offender registration statute was improper because, in his view, the statute (both on its face and as applied), violates his right to procedural due process, which right is guaranteed by both the United States and Rhode Island Constitutions. The appellant further argues that, as applied to the facts of his case, the statute violates his right to substantive due process. He also contends that the statute is not compatible with the principle of separation of powers that is set forth in article 5 of the Rhode Island Constitution. The appellant further argues that application of the statute to his case constitutes a violation of the state constitutional prohibition against *ex post facto* laws.

In addition to his constitutional contentions, appellant also urges this Court to hold that the reviewing magistrate in the Superior Court clearly erred when he found that appellant had failed to show, by a preponderance of the evidence, that the board of review's classification of him as a Risk Level III offender was not in compliance with the law.

For the reasons set forth below, it is our view that a portion of chapter 37.1 of title 11, in some instances, could be irreconcilable with the constitutionally protected right to procedural due process. Nevertheless, in view of what actually transpired

---

1. A Risk Level III offender is one who is deemed to be at high risk of reoffending. *See* Rhode Island Office of the Attorney General Sex Offender Community Notification Unit, Sexual Offender Community Notification Guidelines, § 1–13–3.

in this case, it is clear to us that Mr. Germane himself was not in fact deprived of that, or any other, constitutional right. In addition, we can perceive no basis for ruling that the magistrate committed clear error in upholding the board of review's risk level classification of appellant. We therefore affirm the judgment of the Superior Court.

## Facts[2] and Travel

### I

### Underlying Criminal Offenses

This case ultimately stems from appellant's commission of four first-degree sexual assaults against three victims (one victim having been the object of two such assaults) in the Spring of 1998.[3]

The first assault, which occurred on April 7, 1998, involved one act of forcible or coerced vaginal intercourse. In her statement to the police, the nineteen-year-old victim related how she had voluntarily entered Mr. Germane's truck on the evening of the assault. After he began driving her to an unknown location, she asked to leave the vehicle, whereupon appellant withdrew a folding knife and threatened her. He then drove her to a secluded location in East Providence, where he sexually assaulted her.

The second assault, which occurred about a week later, on April 15, 1998, also involved one act of forcible or coerced vaginal intercourse. The forty-eight-year-old victim was cognitively impaired as the result of a childhood injury.[4] In a state-

---

2. The factual background of this case as reflected in the record must be characterized as murky at best. On the basis of the rather brief nature of the colloquy on the record that took place when the criminal charges which eventually gave rise to the instant case were disposed of through a plea of *nolo contendere*, it appears that Mr. Germane did not actually plead to any specific facts beyond his bare admission of the use of force or coercion in the commission of four sexual assaults. We have attempted to glean as many pertinent facts as possible from the materials submitted to the Sex Offender Board of Review and the additional materials submitted to the Superior Court, which materials constitute the record for judicial review. This troubling lack of factual development and the regrettably brief nature of the plea colloquy will be discussed at greater length *infra*.

3. We note, however, that the board of review appears to make reference to (and the record contains a statement to the police concerning) an uncharged sexual assault against a fourth victim, who appears to have been seventeen years old on May 15, 1998, the date of the alleged assault. The record is unclear as to whether Mr. Germane effectively admitted to this uncharged assault while testifying in the course of a rather confusing exchange with the Assistant Attorney General on cross-examination during the July 2007 hearing before

the Superior Court concerning his risk level classification.

An undated handwritten note of unknown provenance at the top margin of the statement made to the police on May 17, 1998 by the woman who was the complainant with respect to the alleged May 15 assault reads: "Not Charged 404(b)." We infer that the reference is to Rule 404(b) of the Rhode Island Rules of Evidence. The propriety of the application of Rule 404(b) to the victim statement or the consideration of uncharged Rule 404(b) evidence by the board of review is unclear on the face of the record. We are troubled by the manifest lack of transparency surrounding the board of review's characterization and use (if it did so) of this statement and any other documents related to the uncharged offense. Rule 404(b) arises most often in the trial context, where a trial justice presides as the gatekeeper in determining whether or not a given piece of potentially prejudicial evidence of other crimes, wrongs, or acts may be admitted under an exception to the generally exclusionary provisions of Rule 404(b). *See, e.g., State v. Merida*, 960 A.2d 228, 232 n. 8 (R.I.2008) ("Rule 404(b) is fundamentally a rule of exclusion."); *see also State v. Jalette*, 119 R.I. 614, 624–25, 382 A.2d 526, 531–32 (1978).

4. The officer who initially interviewed the victim shortly after the commission of the crime

ment to police, she recounted being forcibly abducted by Mr. Germane, driven to a cemetery in Cranston, and then sexually assaulted. She mentioned being struck by appellant, but she gave the police no indication that a weapon was used during the assault.

The final two assaults, which occurred on May 19, 1998 (and which were committed against a single victim), involved one act of forcible or coerced fellatio and one count of forcible or coerced anal intercourse.[5] The twenty-four-year-old victim acknowledged to the police that she was a prostitute and that she had voluntarily entered Mr. Germane's truck on the evening of the assault. However, she was then forced by appellant to perform an oral sexual act on him in the truck, driven to a secluded location in East Providence, and again assaulted in the woods. She mentioned that she saw a knife on appellant's belt and feared that he might use it against her, but she did not allege that he actually threatened her with the knife.

In view of what the prosecutor, at the time of the plea and sentencing proceeding in January of 2000, would describe as "certain background information and other difficulties with some of the victims,"[6] the state apparently concluded that a plea agreement was preferable to proceeding to trial with respect to the above-summarized offenses. Accordingly, in exchange for a plea of *nolo contendere* by Mr. Germane, the state offered to recommend a sentence

of twenty years at the Adult Correctional Institutions, six months to serve, nineteen and one-half months suspended, with probation.

Prior to the plea and sentencing, the magistrate [7] presiding over the case received two psychiatric assessments of Mr. Germane that had been performed by experts in the field of psychological and sexual evaluation—*viz.*, Dr. Theoharis K. Seghorn and Dr. John P. Wincze. Doctor Seghorn held five extended evaluation sessions with appellant (each involving two to three hours of interviews and testing), while Dr. Wincze held six sessions with appellant (said sessions also involving testing of Mr. Germane and interviews with Mr. Germane and his ex-wife). The two assessments were consistent with one another as to most significant matters; they generally concluded that Mr. Germane was a man of "below average intelligence" and that "he was not aroused by force or aggression or sadism * * *." They further concluded that he is "not a sexual predator," but that he would nonetheless benefit from continued psychological treatment or psychotherapy for the purpose of improving his emotional self-regulation and social skills. Both doctors independently determined that, in their professional opinion, Mr. Germane was at a low risk of re-offense.

On January 6, 2000, appellant pled *nolo contendere* to four counts of first-degree

---

noted in his statement that it was not immediately obvious to him that she was suffering from a brain injury; he stated that he was not aware of her limited mental capacity until he was later informed of it by her legal guardian.

5. In contrast to the facts pertinent to the May 19, 1998 assaults that were articulated at the time of Mr. Germane's *nolo contendere* plea in January of 2000 (see *infra* ), in her statement to police on the night when said assaults occurred, the victim alleged that there had

been forcible or coerced vaginal, not anal, intercourse.

6. The quoted language appears in the transcript of the plea and sentencing proceedings that took place on January 6, 2000.

7. The magistrate who sentenced Mr. Germane in 2000 also presided over the instant case when it came before the Superior Court in 2005.

sexual assault. At that proceeding, appellant admitted that, had the cases proceeded to trial, the state could have proven beyond a reasonable doubt that, over the course of approximately two months, he had committed four acts of sexual assault against three women by the use of force or coercion. The Superior Court imposed the agreed-upon sentence; Mr. Germane was given credit for the six months that he had already served prior to the plea; and he was thereupon released. Several years later, at the time of the review by the Superior Court of the board of review's classification, the magistrate who conducted that review reflected that, although he did "not vividly recall" his thinking at the time of sentencing, he believed that he had agreed to the lenient sentence because "[Mr. Germane is] not a danger to society."

## II

### First Classification by the Board of Review of Sexually Violent Predatory Behavior

A sex offender registration statute was first enacted in Rhode Island in 1992 (P.L. 1992, ch. 196, § 1). In 1996, the General Assembly repealed the original statute, G.L.1956 chapter 37 of title 11, and enacted the Sexual Offender Registration and Community Notification Act, G.L.1956 chapter 37.1 of title 11, as enacted by P.L.1996, ch. 104, § 1 ("the statute"). The new statute required the following persons to register his or her address with a designated state law enforcement agency: (1) anyone convicted of an enumerated criminal offense against a minor victim; (2) anyone convicted of a sexually violent offense; and (3) anyone determined by a newly created board of review to be a sexually violent predator. Section 11–37.1–3. The first two categories of offenders were required to register annually for ten years after the date of conviction and to

verify their addresses quarterly for the first two years after the date of conviction. Section 11–37.1–4. Those individuals in the third category of offenders were required to register indefinitely until such time as a court might determine that a particular individual was no longer a sexually violent predator; offenders in this third category were also required to register their addresses with the appropriate authorities every ninety days. *Id.*

The statute also provided for community notification. Section 11–37.1–12 mandated the creation of a "notification advisory council," the purpose of which was to advise the Attorney General concerning guidelines and procedures that would govern community notification pursuant to the statute. The statute mandated that those guidelines "identify factors relevant to [the] risk of re-offense" and create a three-tiered classificatory scheme depending on the degree of that risk. Section 11–37.1–12(c)(*l*). Offenders at greater risk of re-offense would be subject to more comprehensive community notification than offenders posing a lesser risk.

In 1999 (after the commission of appellant's offenses, but before the disposition of the criminal charges against him), chapter 37.1 of title 11 was amended to create a new category of offenses subject to *lifetime* registration—*viz.*, "aggravated offense[s]," which included most sexual offenses involving sexual penetration and the use or threat of force. Section 11–37.1–2(J), as amended by P.L.1999, ch. 255, § 1. The revised statute required an aggravated offender to register as a sexual offender for life and to update his or her address quarterly. Section 11–37.1–4(c).

Thus, having pled *nolo contendere* to several aggravated sexual offenses (*viz.*, the above-referenced four counts of first-degree sexual assault), under the amended statute Mr. Germane is required to regis-

ter annually in person with local law enforcement and to register his address on a quarterly basis for the rest of his life. Section 11–37.1–4(c).

Following Mr. Germane's plea of *nolo contendere*, the state, acting pursuant to the requirements of the Rhode Island Sexual Offender Registration and Community Notification Act, forwarded appellant's records and information to what was then called the Board of Review of Sexually Violent Predatory Behavior.[8] The board of review was authorized to determine whether a person convicted of a sexually violent offense was a sexually violent predator.[9] Section 11–37.1–6.

The board of review received Mr. Germane's case on February 9, 2000. At that time, a field investigator conducted an interview with him concerning preliminary information about his background, the crimes to which he had pled *nolo contendere*, his plans as to where he would reside and where he would work, and his institutional adjustment.[10] The field investigator's report was also transmitted to the board of review for reference during the classification process.

In May of 2000, the board of review transmitted a one-and-one-half page report to the Office of the Attorney General; that report set forth the board's conclusion that Mr. Germane was a "sexually violent predator." That conclusion was based upon the board of review's determination that he "possesses a personality disorder that makes it likely that he will engage in sexually violent offenses in the future * * *." The board set forth nine factors contributing to its determination.[11]

Approximately a year later, in June of 2001, the state filed a petition with the Superior Court seeking a determination as to whether or not Mr. Germane was a sexually violent predator as indicated in the board's report.

There was no further action taken on the case for a number of years, and Mr. Germane remained an unclassified sexual offender in the interim.

---

**8.** As a result of legislative revisions of G.L. 1956 chapter 37.1 in 2003, the Board of Review of Sexually Violent Predatory Behavior has been replaced by the Sex Offender Board of Review. Section 11–37.1–6, as amended by P.L.2003, ch. 162, § 1.

**9.** The 1999 version of the statute defines a sexually violent predator as being a person who "is possessed of a mental abnormality that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." Section 11–37.1–6(c)(1), as amended by P.L.1999, ch. 255, § 1.

**10.** This report also reflects some apparent confusion about the factual details of the 1998 assaults. For example, the interview form recites that there were "3 victims," but immediately thereafter it identifies four apparent victims.

**11.** The factors listed by the board of review are as follows:

"● Use of threats and violence during the offense

"● Offense was premeditated and calculated

"● Persistent violent restraint during this offense despite victim resistance

"● When arrested, offender had ski masks and other paraphernalia indicative of planned attacks and/or restraint

"● Developed the relationship with the victims for the primary purpose of victimization

"● Offender selected and/or targeted a significantly vulnerable victim

"● Habitual pattern of sexual aggression

"● He refuses to accept responsibility for the crimes

"● No documentation of successful participation in sex offender treatment program."

## III

### Probation Violation

In November of 2003, while the state's petition was still pending before the Superior Court, Mr. Germane was arrested in Central Falls for soliciting two young women from a motor vehicle for an indecent purpose, in violation of G.L.1956 § 11–34–8.1.

According to the witness statement of one Louise Doe,[12] on November 3, 2003, her twin twenty-five-year-old mentally handicapped daughters returned home from a walk and informed their father that a man in a truck had tried to "pick them up." The twins left together shortly thereafter to walk to a pharmacy. Ms. Doe observed a black pick-up truck outside her home, so she and her husband decided to follow the twins in their own vehicle. Ms. Doe recorded the truck's license plate number for later reference.

She watched the truck pull into the parking lot of a fast-food restaurant adjacent to the pharmacy. She recalled seeing a man get out of the truck and speak to her daughters. By Ms. Doe's account, she was hiding in some bushes nearby and overheard the man offer her daughters $20 to get into his truck. The two women refused and went into the pharmacy.

Ms. Doe then confronted the man, whom she described as a "tall, white male with a beard;" at that point, the man returned to the truck and drove away.[13] The appellant was later charged in the District Court with having solicited the two women from a motor vehicle for indecent purposes, a misdemeanor offense.

The state filed a violation report in the Superior Court for Providence County pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, alleging that Mr. Germane had violated the terms and conditions of his probation.

The Superior Court ordered and obtained an evaluation of appellant from Dr. Alan Feinstein, a clinical psychologist working for the state. In a letter to the trial justice, Dr. Feinstein asserted that he was "in full agreement with the findings and opinions of both John Wincze, Ph.D., and Thomas Seghorn, Ph.D., in that [he did] not believe that Mr. Germane is a violent individual or one who is in need of sexual offender treatment."[14]

Doctor Feinstein did nevertheless make several recommendations. First, he recommended that Mr. Germane continue taking his prescribed antidepressant medication. (At the time of the solicitations in Central Falls, appellant had, without the advice or concurrence of his treating physician, unilaterally decided to stop taking his prescribed medications.) Second, Dr. Feinstein recommended that Mr. Germane participate in both individual and group therapy.[15] Doctor Feinstein expressed his

---

12. We have changed the name of the actual witness to a pseudonym so as to respect her privacy and that of her family.

13. Mr. Germane matches the description provided by Louise Doe. Indeed, Mr. Germane later admitted that he had spoken to Ms. Doe's daughters.

14. It will be recalled that Dr. Wincze and Dr. Seghorn had performed psychiatric assessments of Mr. Germane before he pled *nolo contendere* and was sentenced in January of 2000.

15. At the time of the Central Falls solicitations, Mr. Germane was experiencing a disruption in his personal life (*viz.*, the dissolution of a long-term romantic relationship). The fact that the probation violation occurred when Mr. Germane was going through an unsettled period in his personal life is significant because one can infer from the record that similar circumstances precipitated the several earlier sexual assaults to which he eventually pled *nolo contendere*. At the time when those crimes were committed (1998), Mr. Germane was in the midst of a divorce

belief that individual therapy would "help[ ] [Mr. Germane] * * * understand the nature and extent of his problems in addition to developing new coping strategies for when he experiences emotionally difficult times." Doctor Feinstein recommended group therapy to help Mr. Germane "develop[ ] more appropriate social skills."

While Mr. Germane was incarcerated before the Superior Court's ruling on the probation violation issue, Dr. Wincze visited him in December of 2003 and prepared a psychological evaluation at the request of Mr. Germane's attorney. In addition to having assessed Mr. Germane prior to his plea in 2000, Dr. Wincze had also seen him in voluntary treatment from the time of his plea until April 2002. After his meeting with appellant at the Adult Correctional Institutions in December 2003, Dr. Wincze opined as follows:

"Mr. Germane is a very immature and concrete man who functions at a below normal level of intelligence. He is childlike and ineffectual in problem solving and is especially handicapped when struggling with upsetting emotions. In the past, medication has been effective in moderating his emotions and therapy has provided structured guidance. Without medication and without therapy and faced with unemployment, free time and an emotional problem, Mr. Germane was overwhelmed at the time of the [probation violation]. His solution was impulsive and poorly planned and he ignored the obvious risks involved.

"Mr. Germane would benefit from being reevaluated for medication and also from again participating in *active* thera-

from his first wife. He told both Dr. Seghorn and Dr. Wincze that he sought out the women involved in the 1998 incidents partly as a result of his sexual frustration and partly under the assumption that they were prostitutes.

py at least until he is employed and emotionally stable. Following meeting both of these conditions, I would recommend that he remain in therapy on a *maintenance* basis throughout the length of his probation." (Emphasis in original.)

Mr. Germane admitted having violated the terms of his probation by failing to maintain good behavior, and on April 11, 2004, the court continued him on his prior sentence on two conditions: (1) that he continue to take antidepressant medication for however long it was prescribed by his treating physician; and (2) that he participate in individual or group counseling "as deemed appropriate by and under the auspices of a qualified mental health practitioner." The Superior Court specifically determined that Mr. Germane "is not in need of sexual offender counseling, and same is not ordered."

The misdemeanor charge with respect to the underlying solicitation incident was later dismissed in consideration of the violation adjudication and the reluctance on the part of witnesses to testify.

# IV

## Second Classification by the Sex Offender Board of Review

On May 20, 2004, the Superior Court granted the state's motion to remand Mr. Germane's case to the Sex Offender Board of Review for reconsideration in light of the 2003 amendments to the Sexual Offender Registration and Community Notification Act.[16]

16. This remand was authorized by the then newly enacted § 11-37.1-20, as amended by P.L.2003, ch.162, § 2, which provided for the remand of cases pending adjudication of sexually violent predator status; the cases were to be remanded to the Sex Offender Board of

On March 2, 2005, the board of review issued a one-and-one-half page risk assessment report concerning Mr. Germane. Less than a quarter of the report concerned appellant directly; the other half was a generic description of the risk assessment instrument used to evaluate appellant's risk of re-offense.[17]

Attached to the report was a one-page coding form for a risk assessment instrument commonly used to evaluate risk of recidivism for sexual offenders—*viz.*, the STATIC–99.[18] Mr. Germane was determined to have two "individual risk factors" on the STATIC–99, which translates to a "Moderate–Low" risk of re-offense according to that instrument's scoring key.

Review for risk level determinations under a revised procedure.

**17.** It appears that it is the board of review's standard operating procedure to include such a generic description of the risk assessment instrument in its risk assessment reports.

**18.** The board of review's report described the STATIC–99 risk assessment instrument as follows:

"The STATIC–99 is an instrument designed to assist in the prediction of sexual and violent recidivism for sexual offenders. This risk assessment instrument was developed by Hanson and Thornton (1999) based on follow-up studies from Canada and the United Kingdom with a total sample size of 1,301 sexual offenders. The STATIC–99 consists of 10 items and produces estimates of future risk based upon the number of risk factors present in any one individual. " * * *.

"The recidivism estimates provided by the STATIC–99 are group estimates based upon reconvictions and were derived from groups of individuals with these characteristics. As such, these estimates do not directly correspond to the recidivism risk of an individual offender. The offender's risk may be higher or lower than the probabilities estimated in the STATIC–99 depending on other risk factors not measured by this instrument."

The board of review had access to all of the information, records, and reports previously available to the Board of Review of Sexually Violent Predatory Behavior,[19] including appellant's February 9, 2000 interview with a member of the Sex Offender Community Notification Unit. The board of review did not reinterview Mr. Germane when considering his risk assessment.

The board also considered a 2005 report from Michael Stevens, a therapist at Behavioral Medicine & Health Associates. Mr. Germane was participating in group therapy under the aegis of that organization; in his report, Mr. Stevens described the group as consisting of "individuals who have sexually assaulted or who have sexually inappropriate behavior."[20]

**19.** The documents to which the board of review had access included: the criminal docket sheet relating to Mr. Germane's original offenses; various statements to police concerning the original offenses; police reports and crime scene analyses; the interview form completed in 2000 by the Sex Offender Community Notification Unit; the psychological evaluations performed by Dr. Seghorn and Dr. Wincze in 1999; Mr. Germane's criminal history record, dated February 2, 2005, which included the record of his 2003 arrest for soliciting from a motor vehicle for indecent purposes.

**20.** Interestingly, the report prepared by Michael Stevens bears the subheading "Summary of Sexual Offender Specific Treatment." It will be recalled that the Superior Court specifically noted in its 2004 order concerning Mr. Germane's admitted probation violation that "defendant is not in need of sexual offender counseling, and same is not ordered."

It appears from Mr. Stevens's report that Mr. Germane voluntarily enrolled himself in the program, albeit with some reluctance; it further appears that he enrolled "at the suggestion of his attorney." Later in the same report, Mr. Stevens noted: "Tom [Germane] participates because he is required to. * * * He regards his involvement in therapy as coerced and he is quite guarded around self-disclosures."

Mr. Stevens made the following notation apropos of Mr. Germane:

"Tom does not make the connection * * * that in the past when he experienced difficulties or things were not stable he responded in self-destructive behaviors such as his sexually inappropriate behavior or isolating himself. [He] is also unable to express any concern for others regarding his acting out behaviors and the consequences these behaviors have for others. His lack of appreciation on both of these dimensions makes him less prepared to cope with future problems should they occur."

However, it is also significant that Mr. Stevens made the following further notation:

"Based on two separate Risk Assessment Measures which examined his current life adjustment and participation in treatment [Mr. Germane] scores at low moderate to low in terms of current risk. Factors generally associated with high risk recidivism are absent for Mr. Germane. These risk assessments are based only on information [Mr. Germane] has provided[.] * * * If this information is not accurate[,] the risk findings would be meaningless."

Mr. Stevens concluded as follows: "[Mr. Germane] is not motivated in treatment and does not perceive a need to make changes. * * * He must be regarded as in the earliest stages of treatment in which defensiveness and resistance are present at levels that interfere with progress."

Upon consideration of the above-described materials, the board of review classified appellant as an overall Risk Level III. A Risk Level III classification relates to an offender who is at high risk to recidivate. The board's explanation of the apparent discrepancy between Mr. Germane's STATIC–99 score and his ultimate risk level classification was as follows:

"Based on a review of other risk factors in this case, the Board recommends that this STATIC–99 score under represents Mr. Germane's risk at this time. The other risk factors considered that led the Board to this conclusion were the following:

"Stable variables: Sexual self-regulation and General self-regulation;

"Acute variables: Anger/Hostility, (SONAR, Hanson & Harris, 2000)."

The board provided no further elaboration, nor was there any explication of these rather cryptic comments.

Sexual offender community notification is currently governed by the guidelines promulgated in 2007 by the Rhode Island Parole Board pursuant to § 11–37.1–12. Section 9.0 of the guidelines directs that

---

Mr. Stevens further noted in his report that Mr. Germane was "quick to remind [him] that he was referred to [the] group for 'social skills' and not for sexual offending." Mr. Stevens proceeded to record that "[o]n several occasions [Mr. Germane] has asked when the social skills work is going to begin for him." In fact, in his 2004 report to the Superior Court, Dr. Feinstein recommended Mr. Germane to group therapy in order to develop "more appropriate social skills" and advised as follows: "I do not believe that Mr. Germane * * * is in need of sexual offender treatment." It appears from Mr. Stevens's report that Mr. Germane was aware of this assessment and did not, at that time, believe himself to be in need of sex offender specific treatment despite the subheading of Mr. Stevens's report.

Mr. Germane's account is not to the contrary; he testified that, after trying and failing to secure counseling at various mental health facilities on his own, he contacted his probation officer for a referral "because [he] just figured they deal with sex offenders * * *." He further testified that the probation officer told him that he "had to go to this guy, Mike Stevens." Mr. Germane recalled that Mr. Stevens "is a sex offender counselor, and he also * * * works on social skills."

local law enforcement shall provide an "offender fact sheet" [21] to any member of the community likely to encounter appellant. Local law enforcement is further required to notify the community of the offender's presence using a variety of other public information resources—including news releases, fliers, and advertisements in local newspapers. As an aggravated offender, appellant will be subject to community notification for life and will be required to register quarterly with local law enforcement officials.

As required by statute, the board of review notified Mr. Germane of his classification and advised him of his right to appeal that decision to the Superior Court. Availing himself of the provisions of § 11-37.1-13, appellant timely filed an application for judicial review of the board's determination.

Some time after appellant filed his application for review but before the first scheduled hearing in the matter, the magistrate assigned to handle appeals of the board of review's risk assessments advised the Office of the Attorney General that the exceedingly brief reports issued by the board of review, coupled with the STATIC–99 coding forms, constituted an insufficient record for meaningful judicial review in such cases. [22] The magistrate felt that he "would have some difficulty making a determination of a level of notification based strictly on a risk assessment tool." The Office of the Attorney General thereafter supplemented at least some of the board of review reports then undergoing review before the Superior Court (including appellant's) with additional information elaborating on the basis for the board of review's risk level determination.

This one-page supplemental attachment provided a somewhat more complete description of the materials reviewed by the board of review in making its classification of Mr. Germane; in the words of that attachment, those materials included "[the] criminal record [and] police, institutional, probation/parole supervision, and treatment information * * *." The board of review also noted a number of "characteristics" specific to appellant's case that in its judgment militated in favor of a higher risk assessment than that indicated by the results of the STATIC–99. [23]

---

**21.** The "offender fact sheet" sets forth the offender's name, date of birth, address or approximate address, physical description, criminal history, and other personal information.

**22.** We consider as laudable the magistrate's sensitivity to the need for there to be a sufficient record for meaningful judicial review to take place.

**23.** As elsewhere, the "characteristics" that are described as features of the *current* sex offense" (*i.e.*, the 1998 assaults) (emphasis in original) are as we describe below inconsistent with various portions of the record before the board of review.

As in the first report issued by the Board of Review of Sexually Violent Predatory Behavior, the Sex Offender Board of Review noted sexual assaults against four victims. Mr. Germane, in fact, pled *nolo contendere* to four counts of first-degree sexual assault against three women. (It appears that the board of review considered the uncharged alleged sexual assault of May 15, 1998 in preparing its report.) The supplemental attachment asserts that Mr. Germane committed "multiple acts against victims in each criminal episode"—although, in fact, only one victim alleged multiple assaults. The board of review also noted "offenses against particularly vulnerable victims such as the handicapped"—although, in fact, only one of the 1998 victims was cognitively impaired.

The board of review also noted Mr. Germane's "poor commitment to current sex offender specific treatment"—despite the fact that Mr. Germane was voluntarily participating in sex offender treatment and despite the fact that the Superior Court had previously opined that he was not in need of such treatment.

## V

### Superior Court Review[24]

Before convening a hearing in open court, the Superior Court magistrate,[25] acting pursuant to § 11–37.1–15, conducted an *in camera* review of all the materials that formed the basis for the board of review's determination of Mr. Germane's risk level and the manner of community notification. At that time, the magistrate also made the statutorily mandated determination as to "whether and to what extent the production of witnesses and cross examination [should] be required or permitted depending on the complexities of the matter involved, [and] the extent of doubt concerning the correctness of the level, nature and extent of the notification proposed * * *." Section 11–37.1–15(a)(2). The magistrate also indicated that appellant would be "permitted to present testimony from witnesses regarding the correctness of the level, nature and extent of the notification proposed" by the board of review.

The Superior Court magistrate conducted a hearing with respect to Mr. Germane's status on July 6, 7, 11, and 12, 2005. At the outset, Mr. Germane's attorney moved to strike and dismiss the board of review's determination that appellant should be classified as a Risk Level III offender. Counsel argued that chapter 37.1 of title 11 is unconstitutional both on its face and as applied; she further asked the Court to reject the findings and conclusions of the board of review on the ground that they were entered into in violation of Mr. Germane's state and federal constitutional rights. Specifically, counsel challenged the statute as being violative of appellant's right to both procedural and substantive due process and as also being violative of his right to equal protection. She further contended that the statute violated the separation of powers doctrine and was also an unconstitutional *ex post facto* law.

The magistrate noted that the issue before him was whether or not appellant presented a danger to the community and whether or not "his actions and his conduct require this community, wherever it may be, to be put on notice of the fact that Mr. Germane is in the community * * * so as to protect the health and safety of the public at large * * *." To the extent that Mr. Germane challenged the registration requirement associated with the sex offender registration and notification process, the magistrate concluded as follows:

"Mr. Germane pleaded *nolo contendere* * * * to three sex offenses. * * * As a condition of his plea, * * * he is re-

---

We note that the board of review also cited a number of characteristics which *are* clearly supported by the record—including a "pattern of repetitive and/or compulsive sexually aggressive behavior, involving separate incidents;" "[o]ffender's denial of the crimes;" and "the public nature of his criminal pattern."

24. When the Superior Court conducts a judicial review of a classification by the board of review, the state has the initial "burden of going forward, which burden shall be satisfied by the presentation of a prima facie case that justifies the proposed level of and manner of notification." Section 11–37.1–16(a).

The term "prima facie case" in this context has been statutorily defined as meaning that "(1) [a] validated risk assessment tool has been used to determine the risk of re-offense; [and] (2) reasonable means have been used to collect the information used in the validated assessment tool." Section 11–37.1–16(b), as amended by P.L.2003, ch. 162, § 1.

25. It will be recalled that the magistrate who presided over the instant case is the same magistrate who presided over Mr. Germane's plea and sentencing proceedings in January of 2000 with respect to the four first-degree sexual assaults that appellant committed in the Spring of 1998.

quired to register as a sex offender in the community in which he resides.

" * * * To seek to modify the registration aspect of his plea would require a modification in the sentence that was imposed, and very well may modify or vacate the plea which he entered. At the very minimum, Mr. Germane would have to file a [Super. R.Crim. P.] 35 motion to modify [or to correct an illegal sentence]."

The magistrate concluded that the illegal sentence issue was not properly before the court, and he denied "the motion to negotiate or modify the requirement of registration." The magistrate also denied the motion challenging (on various constitutional grounds) both the statute and the board of review's determination. He noted that "the very reason that we are here today [is to] give Mr. Germane his due process and an opportunity to be heard."

The state then introduced the STATIC–99 into evidence and indicated that it constituted the state's *prima facie* case. Mr. Germane's counsel objected on two grounds. While conceding that the STATIC–99 may be a validated risk assessment tool, counsel first argued that the state had not introduced any evidence showing that it had been "performed * * * by a qualified person who has been trained in the use of the tool." Counsel further argued that whoever used the tool had considered "factors that are not part of the factors * * * dictated in the STATIC 99 [manual];" she contended that that person had "bumped up the level with factors that are not part of the facts [while] ignor[ing] other dynamic factors that should be included."

The magistrate accepted the STATIC–99 over the just-summarized objections,

and he took "judicial notice of decisions rendered in other jurisdictions that recognize the STATIC 99 as a valid risk assessment tool." The state then rested.

Pursuant to the provisions of § 11–37.1–16(a), the burden then shifted to Mr. Germane to demonstrate, "by a preponderance of the evidence that the determination [of] either the level of notification [or] the manner in which it is proposed to be accomplished is not in compliance with this chapter or the guidelines adopted pursuant to [chapter 37.1]."

The appellant presented the testimony of Carol Ball, Ph.D. (a licensed psychologist specializing in the treatment and evaluation of sexual offenders) and Alan Feinstein, Ph.D. (the supervising clinical psychologist for the Department of Corrections, who had previously evaluated Mr. Germane at the time of his probation violation). In addition, Mr. Germane also testified on his own behalf.

Doctor Ball testified that she had met with Mr. Germane on two occasions during the Summer of 2007 in order to conduct a clinical diagnosis and evaluation and to perform several psychological tests. In addition, Dr. Ball reviewed (1) the reports of prior treatment providers; (2) the board of review's STATIC–99 risk assessment; and (3) numerous law enforcement records relating to Mr. Germane's offenses. She agreed that appellant would score a 2 on the STATIC–99; but, unlike the board of review, she believed that that score *overestimated* Mr. Germane's risk of re-offense. She based this conclusion on the fact that appellant had been "incident-free" between 2000 and 2005.[26] She also discussed the limitations of the STATIC–99 as a pre-

---

26. As for the 2003 probation violation, Dr. Ball noted that "there was no conviction;" and she said that, for that reason, she had

opted not to consider it in her STATIC–99 evaluation of Mr. Germane.

dictive instrument in individual cases generally.

Doctor Feinstein testified that he continued to believe that appellant presented a low risk to recidivate; this opinion was "predicated on [Mr. Germane's] receiving what [Dr. Feinstein] consider[ed] to be appropriate treatment and monitoring * * *." He noted that, when Mr. Germane committed his probation violation in 2003, he was not then in treatment; he added that "[w]hile he was in treatment, there were no problems." He recalled that he had recommended counseling in 2003 because "Mr. Germane would get himself in trouble when things were not going well in his personal life;" Dr. Feinstein further opined that "individual counseling would help [Mr. Germane] towards recognizing and controlling his activities, a means to deal with those feelings and issues." It was his opinion, however, that Mr. Germane's "risk of reoffending would be significant were he not receiving any treatment."

The appellant testified that the 1998 sexual assaults occurred because he was lonely, depressed, and angry following the dissolution of his first marriage. Although he maintained that he originally picked up the women believing them to be prostitutes, he admitted that he ultimately forced all three to have sex with him. He denied that he had used a weapon in the commission of the crimes, although he acknowledged that he did keep a knife holster in his truck for work-related reasons.

Mr. Germane also confirmed that he stopped taking his prescribed antidepressant medication in 2002 because he no longer felt that doing so was necessary. During that same period, he was also in the process of breaking up with his then-girlfriend. Although he acknowledged that his behavior at the time of the Central Falls incident in 2003 was inappropriate,

he reiterated that he was simply seeking female companionship and did not intend to assault the two women.

On October 3, 2005, the magistrate ultimately affirmed the board of review's classification of appellant as a Risk Level III offender. The magistrate concluded that Mr. Germane failed to prove by a preponderance of the evidence that the risk level classification and proposed manner of community notification were not in compliance with the Sexual Offender Registration and Community Notification Act or the relevant guidelines adopted pursuant to said statute. He further found as follows:

"[A] valid risk assessment tool, Static 99, was used. Other variable factors (although treated differently for score results) were considered by the Board [of Review] and listed in its supplemental report. * * * These factors were properly utilized in determining the [Board of Review's] recommendation."

The magistrate noted that "defendant introduced no evidence that the *extent of notification* called for by his tier categorization was excessive because of unique aspects of his case." (Emphasis in original.) Rather, he noted, appellant challenged his assessed level of risk by presenting the reports and testimony of the various mental health professionals that had evaluated him since 1999.

The magistrate noted that the reports of both Dr. Seghorn and Dr. Wincze's suggest that Dr. Germane committed the 1998 sexual assaults impulsively as the result of unsettled circumstances in his personal life. The magistrate further noted that both Dr. Ball and Dr. Feinstein "appeared to gloss over or ignore the incident in November of 2003;" with respect to that incident, the magistrate observed that "the conduct was similar to conduct which resulted in defendant's original conviction." He further observed that the 2003 proba-

tion violation "involved two handicapped girls who were strangers," and he added that these facts resembled those present in one of his 1998 offenses (also involving an adult, mentally handicapped, female stranger). The magistrate opined that Mr. Germane's more innocuous account of the 2003 incident, as related during the hearing, "was totally lacking in credibility * * *."

The magistrate concluded that appellant had not met his burden of persuasion, and he upheld his classification by the board of review as a Risk Level III offender.

Mr. Germane timely filed this appeal from the Superior Court's judgment.

## Standard of Review

### I

### Constitutional Issues

As we have often noted, "[t]his Court uses the greatest possible caution when reviewing a constitutional challenge to a statute." *State v. Faria*, 947 A.2d 863, 867 (R.I.2008) (internal quotation marks omitted); *see also State v. Hall*, 940 A.2d 645, 657 (R.I.2008). A corollary of that cautionary principle is that, when we assess a challenge to the constitutionality of a statute, we begin with the principle "that legislative enactments of the General Assembly are presumed to be valid and constitutional." *Newport Court Club Associates v. Town Council of Middletown*, 800 A.2d 405, 409 (R.I.2002) (internal quotation marks omitted). One who challenges the constitutionality of a statute bears the burden of proving beyond a reasonable doubt that the challenged statute violates either the Rhode Island or the United States Constitution. *See Gem Plumbing & Heating Co. v. Rossi* 867 A.2d 796, 808 (R.I.2005); *see also Cherenzia v. Lynch*, 847 A.2d 818, 822 (R.I.2004).

Furthermore, a "trial justice's findings on mixed questions of law and fact are generally entitled to the same deference as the justice's findings of fact." *Cummings v. Shorey*, 761 A.2d 680, 684 (R.I.2000) (internal quotation marks omitted) (citing *Hawkins v. Town of Foster*, 708 A.2d 178, 182 (R.I.1998)). But, when those mixed questions of law and fact impact constitutional matters, we review the findings *de novo*, pursuant to the principles set forth in *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *see Cummings*, 761 A.2d at 684 (applying the *Ornelas* standard in a civil case).

### II

### Findings of Fact in a Nonjury Civil Proceeding

We review with deference the factual findings made by a trial justice in a nonjury case. *See, e.g., Manchester v. Pereira*, 926 A.2d 1005, 1011 (R.I.2007) ("This Court views deferentially the factual findings of a trial justice sitting in a nonjury case."). In accordance with that principle, we "will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." *Macera v. Cerra*, 789 A.2d 890, 892–93 (R.I.2002) (internal quotation marks omitted). If it becomes clear to us that "the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for [the trial justice's] even though a contrary conclusion could have been reached." *Tim Hennigan Co. v. Anthony A. Nunes, Inc.*, 437 A.2d 1355, 1357 (R.I.1981).

### III

### Statutory Interpretation

This Court reviews questions of statutory interpretation in a *de novo* man-

ner. *Rison v. Air Filter Systems, Inc.,* 707 A.2d 675, 678 (R.I.1998). With respect to that interpretive task we have said: "When interpreting a statute, our ultimate goal is to give effect to the General Assembly's intent. * * * The best evidence of such intent can be found in the plain language used in the statute. Thus, a clear and unambiguous statute will be literally construed." *Martone v. Johnston School Committee,* 824 A.2d 426, 431 (R.I.2003); *see also State v. Santos,* 870 A.2d 1029, 1032 (R.I.2005); *State v. Grayhurst,* 852 A.2d 491, 516 (R.I.2004). "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *State v. DiCicco,* 707 A.2d 251, 253 (R.I.1998) (internal quotation marks omitted).

## Analysis

### I

#### Due Process Claims

 Both the state and federal constitutions provide that no person shall be deprived of "life, liberty, or property * * * without due process of law." U.S. Const. Amend. XIV; R.I. Const. art. 1, sec. 2. As the United States Supreme Court has explained: "[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Mr. Germane's arguments raise issues concerning both procedural and substantive due process rights under the federal and state constitutions.

The guarantee of procedural due process assures that there will be fair and adequate legal proceedings, while substantive due process acts as a bar against "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *L.A. Ray Realty v. Town Council of Cumberland,* 698 A.2d 202, 210 (R.I.1997) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). We shall now proceed to address each of appellant's due process contentions in turn.

### A

#### Procedural Due Process

Mr. Germane attacks the proceedings before the board of review on the ground that he "was given no process whatsoever: no notice and no hearing." While he acknowledges that he was given the opportunity to present evidence before the Superior Court in the context of its judicial review of the board of review's risk level assessment, he contends that the allocation of the burden of persuasion at that hearing deprived him of due process under the law.

 In cases involving procedural due process concerns, we have previously employed the three-part test articulated by the United States Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See, e.g., City of Pawtucket v. Pimental,* 960 A.2d 981, 988 (R.I.2008). Under the test set forth in *Mathews,* three factors are to be considered in determining whether a procedure violates due process:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative bur-

dens that the additional or substitute procedural requirement would entail." *Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

### 1. The Private Interest Affected by the Government Action

■ Proceeding in accordance with the analytic approach outlined in *Mathews,* as a first step we must ascertain the nature of the private interest implicated by the Sexual Offender Registration and Community Notification Act.

In 1994, Congress enacted 42 U.S.C. § 14071, which conditioned state access to certain federal funds on the states' adoption of sexual offender and community notification programs. Within a few years, every state had created such a program, although the features of the various schemes varied significantly from state to state. In many states, the requirement of registration and community notification is based exclusively on the fact of a previous conviction of one of certain enumerated offenses. *See, e.g.,* Conn. Gen.Stat. §§ 54–251, 54–252, 54–254 (2001); Fla. Stat. § 943.0435 (2007); Mich. Comp. Laws § 28.721a (2003). The United States Supreme Court has upheld these types of sex offender registration statutes against due process challenges on the ground that "the [sex offender] registry requirement [is] based on the fact of previous conviction, not the fact of current dangerousness." *Connecticut Department of Public Safety v. Doe,* 538 U.S. 1, 4, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003). In upholding the Connecticut sex offender registration statute, the Supreme Court made particular note of the fact that "the public registry explicitly states that officials have not determined that any registrant is currently dangerous." *Id.*[27]

A minority of states, including Rhode Island, have adopted "two tier" sex offender registration programs. Under a two-tier approach, an individual offender's risk level designation does not turn on criminal conviction alone. In an ancillary civil or administrative proceeding, facts other than conviction are used to assess the risk of future dangerousness, and this risk level determination then dictates the scope of community notification.[28]

Several of our sister state courts have had the opportunity to consider the due process implications of such "two-tier" schemes, and most (if not all) have concluded that a "liberty interest is at stake whenever a sex offender risk assessment is

---

**27.** In contrast, the Rhode Island Parole Board & Sex Offender Community Notification Unit website makes the following statement with respect to Risk Level III sexual offenders: "The Board and/or the Court have determined that this individual is at a high risk to re-offend and that the degree of dangerousness posed to the public is such that a public safety interest is served by the providing information below to the public availability of notification information [*sic*]."

**28.** Under the "two tier" approach, the first tier is the triggering criminal conviction. At the second tier, "the recidivism risk levels of offenders are assessed on the basis of specified criteria during a hearing before a court or a specially constituted board, with due process rights afforded to the offender. The

evaluative outcome determines the extent, method, and duration of public notification experienced by offenders." Wayne A. Logan, *Liberty Interests in the Preventive State: Procedural Due Process and Sex Offender Community Notification Laws,* 89 J.Crim. L. & Criminology 1167, 1175 (1999). According to the federal guidelines concerning sexual offender registration laws, a two-tier system employing "particularized risk assessments * * * with differing degrees of information release[d] based on the degree of risk" is "consistent with the requirements of the [federal] Act * * *." Megan's Law; Final Guidelines for the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, as amended, 64 Fed.Reg. 572, 582 (1999).

conducted." *Brummer v. Iowa Department of Corrections,* 661 N.W.2d 167, 175 (Iowa 2003); *see, e.g., State v. Samples,* 347 Mont. 292, 198 P.3d 803, 808 (2008) (holding that there is a liberty interest at stake when a sexual offender is designated as a particular risk level); *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 417 (1995) (same); *Noble v. Board of Parole and Post–Prison Supervision,* 327 Or. 485, 964 P.2d 990, 995–96 (1998) (concluding that the determination that a person is a predatory sex offender implicates a liberty interest when an agency gathers and synthesizes evidence in making such a determination); *Commonwealth v. Williams,* 557 Pa. 285, 733 A.2d 593, 607 (1999) (holding that separate proceedings to determine whether a convicted sex offender is a sexually violent predator for purposes of registration and community notification implicates a protected liberty interest); *State v. Briggs,* 199 P.3d 935, 945 (Utah 2008) (stating that "the statutorily mandated designation of 'currently dangerous' changes the legal status of listed offenders"); *cf. Doe v. Attorney General,* 426 Mass. 136, 686 N.E.2d 1007, 1012 (1997) (holding that an offender subject to an automatic registration requirement entailing limited community notification nonetheless "has sufficient liberty and privacy interests * * * that he is entitled to procedural due process before he may be required to register and before information may properly be publicly disclosed about him").

Community notification in Rhode Island with respect to Risk Level III offenders, like appellant, entails widespread dissemination of a sexual offender's personal information within his or her community:

"Community Notification requires disclosure of identifying information in the form of an 'Offender Fact Sheet' to (1) the victim and/or witnesses of the offense for which [an offender has] been convicted; (2) those organizations [the offenders] are likely to encounter, such as schools, day care facilities, and other social and religious agencies in the area where [the offender] will be living and/or working; and (3) those individual members of the public with whom [the offender is] likely to encounter; including "* * *

"Providing public access to hard copies of the offender fact sheet at the Law Enforcement Agency;

"News releases; or

"Fliers; or

"Advertisements in local newspapers; or

"Providing the public with computerized access to the information contained in the Offender Fact Sheet."

Sexual Offender Community Notification Guidelines, Notice to Level II and Level III Offenders.

More significantly for the purposes of identifying a cognizable liberty interest, Risk Level III community notification informs the public that a sexual offender has been determined to be currently dangerous and at high risk to reoffend in the future.

In 1971, the United States Supreme Court explicitly held that, pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, government may not deprive individuals of their liberty interest in reputation without due process of law. *See Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). Subsequently, however, the Supreme Court subsequently clarified its holding in *Constantineau* in the case of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47

L.Ed.2d 405 (1976), in which it held that damage to reputation alone is an insufficient basis for a procedural due process claim; there must additionally be some further showing that the complained-of state action has "deprived the individual of a right previously held under state law." *Id.* at 708, 96 S.Ct. 1155; *see generally* Maureen Fox, Note, *Constitutional Law—Due Process—the Interests in Reputation and Employment—Paul v. Davis and Bishop v. Wood,* 18 B.C. Indus. & Com. L.Rev. 545 (1977). The clarified standard that was articulated in *Paul v. Davis* has come to be known as the "stigma plus" standard. Under this standard, the government must provide constitutionally adequate process before a "right or status previously recognized by state law [is] distinctly altered or extinguished" by state action. *Paul,* 424 U.S. at 711, 96 S.Ct. 1155.

In deciding whether or not the state action involved in this case (*i.e.,* appellant's risk level determination) impinges on appellant's liberty interests, we must carefully consider the nature of the information to be disseminated within the appellant's community. If we determine that his risk level classification should be upheld, local law enforcement officials, acting pursuant to law, will publish two general categories of information about Mr. Germane: (1) information relating to his prior convictions and his personal information (address, appearance, and so forth); and (2) information apprising the public of his assessed level of current dangerousness. Information relating to prior convictions, physical appearance, address, employer, and so forth is already a matter of public record and does not implicate appellant's liberty interests to any significant degree.

An official designation of appellant's future dangerousness, however, poses a more serious matter for constitutional concern. We note with approbation the following perceptive and eloquent observation by the Supreme Court of Oregon in the case of *Noble v. Board of Parole and Post–Prison Supervision,* 327 Or. 485, 964 P.2d 990 (1998):

> "When a government agency focuses its machinery on the task of determining whether a person should be labeled publicly as having a certain undesirable characteristic or belonging to a certain undesirable group, and that agency must by law gather and synthesize evidence outside the public record in making that determination, the interest of the person to be labeled goes beyond mere reputation. The interest cannot be captured in a single word or phrase. It is an interest in knowing when the government is moving against you and why it has singled you out for special attention. It is an interest in avoiding the secret machinations of a Star Chamber. Finally, and perhaps most importantly, it is an interest in avoiding the social ostracism, loss of employment opportunities, and significant likelihood of verbal and, perhaps, even physical harassment likely to follow from designation. In our view, that interest, when combined with the obvious reputational interest that is at stake, qualifies as a 'liberty' interest within the meaning of the Due Process Clause." *Id.* at 995–96.[29]

Similarly, in Rhode Island, the board of review assesses an offender's *current and future dangerousness* based on a limited documentary record. Then, after completing the assessment and notifying an of-

---

**29.** We further note that the concerns referred to by the Supreme Court of Oregon are even more pressing in Mr. Germane's case since the instruments employed by the board of review in assessing his risk of future dangerousness predicted a lower risk level than that which was ultimately assigned to him by the board of review.

fender of the results, and pending limited appellate procedures, the individual's status as a convicted sex offender, *together with* information concerning his risk to reoffend, may be transmitted to the public—potentially exposing the offender to such consequences as vigilantism, police surveillance, community ostracism, and the foreclosure of employment or associational opportunities.[30]

The fact that certain classes of sexual offenders are subject to lifetime registration and community notification requirements further supports the conclusion that we are dealing with a protected liberty interest.[31] As the Supreme Court of Hawai'i observed in a case involving a due process challenge to a lifetime sexual offender registration law, "requiring lifetime registration of all sex offenders without qualification, noncompliance with which is punishable by criminal penalties, implicates a liberty interest that cannot be curtailed absent procedural protections." *State v. Guidry*, 105 Hawai'i 222, 96 P.3d 242, 250 (2004). Sex offenders like Mr. Germane must adhere to the registration requirements indefinitely or else face criminal repercussions; as a result, their legal status is permanently altered. "The imposition on a person of a new set of legal duties that, if disregarded, subject him or her to felony prosecution, constitutes a change of that person's status under state law." *Doe v. Department of Public Safety*,

271 F.3d 38, 57 (2nd Cir.2001), *rev'd on other grounds* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003) (internal quotation marks and brackets omitted).

For the foregoing reasons, the conclusion is ineluctable that the Sexual Offender Registration and Community Notification Act burdens a protectible liberty interest and therefore triggers the individual's right to procedural due process under both the federal and state constitutions. In so holding, we recall that liberty, as defined by the state and federal constitutions, is "not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and * * * cannot be restricted except for a proper governmental objective." *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *see also Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("[T]he Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.").

## 2. Risk of Erroneous Deprivation of a Protected Interest

Having concluded that the board of review's classification of appellant implicates a protected liberty interest, it goes without saying that the classification process must satisfy the requirements of pro-

---

**30.** Moreover, by law, registered sex offenders may have various other rights and statuses abridged or abolished altogether. For example, as recently as July 2, 2008, the General Assembly amended § 11–37.1–10 to prohibit registered sex offenders from residing within 300 feet of a public or private school. *See* P.L.2008, ch. 189, § 1.

**31.** The Supreme Court of Hawai'i has gone so far as to opine that a lifetime registration requirement for certain classes of sexual offenders is so fundamentally intrusive of the

"right to be free from perpetual government intrusion" that it "goes to the very heart of liberty and does not fall within the ambit of the 'stigma plus' analysis." *State v. Guidry*, 105 Hawai'i 222, 96 P.3d 242, 250 n. 18 (2004). We are disinclined to adopt such an expansive approach, but we nonetheless note that the lifetime registration requirement for sexual offenders in Rhode Island, like Mr. Germane and others in his classification, constitutes a serious consideration in our due process analysis.

cedural due process. The consequent question is, therefore, what is the nature and scope of the process due? As we proceed to answer that question, we shall be mindful of the Supreme Court's statement that "[a]n essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Loudermill,* 470 U.S. at 542, 105 S.Ct. 1487 (internal quotation marks omitted).

### a. *Notice and Hearing*

Mr. Germane first complains about the fact that he was not afforded a hearing before the board of review during the administrative proceeding that determined his risk of future dangerousness. While it is true that, pursuant to the provisions of chapter 37.1 of title 11, appellant did not have a statutory right to a hearing before the Sex Offender Board of Review, it is equally true that he did have a statutory right to appeal that body's risk level classification to the Superior Court. He did in fact exercise that right, and he enjoyed a full evidentiary review hearing before the Superior Court magistrate.

We must first consider the legal effect of the administrative proceeding at the board of review level. Section 11–37.1–13, in pertinent part, provides as follows:

"If * * * the board is satisfied that risk of re-offense by the person required to register is either moderate or high, the sex offender community notification unit of the parole board shall notify the person, in writing, by letter or other documentation:

"(1) That community notification will be made not less than ten (10) business days from the date of the letter or other document evidencing an intent to promulgate a community notice * * * to-

gether with the level, form and nature that the notification will take;

"(2) That unless an application for review of the action is filed within the time specified by the letter or other documentation * * * with the criminal calendar judge of the superior court for the county in which the adult offender who is the subject of notification resides * * * requesting a review of the determination to promulgate a community notification, that notification will take place;

"(3) That should the person subject to community notification, file an application for review on or before the date specified by the letter or other documentation, that no community notification will take place, unless and until affirmed by the court * * *."

The foregoing statutory language makes clear that the board of review's risk level determination has no *immediate* legal effect on a sexual offender's liberty interest. Pursuant to the statute, an offender must be provided with notice of the board of review's determination as well as the ramifications of that disposition. Offenders are further informed of their right to seek judicial review of the board's determination. Filing an application for review effectively suspends the legal effect of the board's determination. As a result, we cannot say that, in this case, appellant's inability to testify before, or present evidence to, the board posed any actual risk of erroneous deprivation of his protected liberty interests. The fact is that appellant was accorded adequate procedural due process in the proceeding before the Superior Court before any community notification took place.

We are substantially more concerned, however, about some aspects of the review proceedings that the statute makes available in the Superior Court. While the present appellant was not de-

prived of his constitutional right to procedural due process since he was *in fact* permitted to present a multifaceted case in the Superior Court, it is nonetheless our opinion that, under different circumstances, the discretion that § 11–37.1–15(a)(2) accords to the reviewing court could result in infringement of a sexual offender's constitutional rights. That statutory provision directs the reviewing court to

> "[d]etermine whether and to what extent the production of witnesses and cross examination shall be required or permitted depending on the complexities of the matter involved, the extent of doubt concerning the correctness of the level, nature and extent of the notification proposed * * *." Section 11–37.1–15(a)(2).

It is clear from this unambiguous statutory language that the reviewing court had the authority to deny Mr. Germane, or any other offender, the right to put on a full case for the purpose of disputing the findings of the board of review or to fully challenge those findings through standard adversarial proceedings.

In our view, this section cannot be reconciled with the constitutional guarantee of procedural due process to the extent that it permits the reviewing court to preclude appellants aggrieved by the board of review's determination from meaningfully challenging their risk level classification.[32] The danger of affirmance of an erroneous risk level classification is substantially more significant in the absence of a hearing before the Superior Court. If there is error in the materials that the agency considered or in its ultimate determination, an appellant would not otherwise have the opportunity to learn of the error, much less an opportunity to correct it.

This potential statutory infirmity (of constitutional magnitude) is cured, however, in cases such as the one before us, when a full evidentiary hearing has in fact been permitted by the Superior Court. It is our view, however, that *all* sexual offenders who opt to appeal their risk level classifications as determined by the board of review must be afforded an opportunity to be heard before the Superior Court; moreover, such hearings must be *meaningful*. See, e.g., *Wolff v. McDonnell*, 418 U.S. 539, 557, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests. * * * We think a person's liberty is equally protected * * *."); *see generally* Henry J. Friendly, *"Some Kind of Hearing,"* 123 U. Pa. L.Rev. 1267 (1975).

### b. *The Burden of Persuasion at the Superior Court Level*

Mr. Germane further complains that the process he was afforded before the Superior Court was "unbalanced and unfair" due to the fact that "the state was not required to prove anything beyond the fact that a risk assessment instrument had been employed by the [Sex Offender Board of Review]." The appellant contends that the burden should, at all times, have been on the state to prove that the board of review's risk assessment was not erroneous.

Pursuant to the plain language of § 11–37.1–16, the state bore the initial burden of making out a *prima facie* case before the Superior Court, whereupon the burden shifted to appellant to rebut the board of review's classification of his risk

---

**32.** In this case, an as-applied challenge would be unavailing given the fact that Mr. Germane himself was, in fact, permitted to call multiple witnesses and to present a full legal argument.

level.[33] To overcome the state's *prima facie* case, Mr. Germane was required to demonstrate, by a mere preponderance of the evidence,[34] that the board of review's determination of either the level of notification or the manner in which it was proposed to be accomplished was not in compliance with chapter 37.1 of title 11 or the guidelines propounded by the parole board. In our judgment, neither the statutory burden shifting scheme, nor the burden to be borne by appellant, denied him his right to procedural due process.

■ It is well established that the "function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (internal quotation marks omitted). With respect to allocation of evidentiary burdens, the United States Supreme Court has noted as follows:

> "[I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky v. Kramer,* 455 U.S.

745, 755, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

It is also well established that the degree of proof required in a particular type of proceeding "is the kind of question which has traditionally been left to the judiciary to resolve." *Woodby v. INS,* 385 U.S. 276, 284, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966).

The allocation of the evidentiary burden was appropriate in this case given the governmental and public interest at stake in the sex offender registration and community notification process (see section 3, *infra* ). As we have previously observed, "the burden of going forward with the evidence may indeed shift from side to side, and this same burden may properly devolve upon a defendant once the state has developed a prima facie case and has adduced evidence sufficient to make it just that the defendant be required to challenge the proof with excuse or explanation." *State v. Neary,* 122 R.I. 506, 511–12, 409 A.2d 551, 555 (1979).[35] Moreover, requiring appellant to overcome the state's *prima facie* case by a preponderance of the evidence (a significantly less demanding showing than either the "clear and convincing evidence" or "beyond a reasonable doubt" standards) is constitutional, especially given that evidence of mistaken or unlawful classification on the part of the board of review would be "peculiarly within [the appellant's] own control and based upon knowledge immediately within his personal reach." *Id.* at 512, 409 A.2d at 555.

---

**33.** We discuss the constitutionality of the statutorily defined *prima facie* case and the attendant burden shifting scheme in greater detail *infra.*

**34.** *See Parker v. Parker,* 103 R.I. 435, 442, 238 A.2d 57, 61 (1968) ("If we could erect a graduated scale which measured the comparative degrees of proof, the 'preponderance' burden would be at the lowest extreme of our scale; 'beyond a reasonable doubt' would be

situated at the highest point; and somewhere in between the two extremes would be 'clear and convincing evidence.' ").

**35.** It is also worth remarking upon the fact that our decision in *State v. Neary,* 122 R.I. 506, 409 A.2d 551 (1979), arose in the criminal law context, wherein the courts are maximally protective of the rights of defendants.

### 3. The Government's Interest

██ The third step in the *Mathews* analysis concerns the nature and extent of the government's interest, including the governmental function involved and the financial and administrative burdens that any additional or alternative procedural requirement would entail. It is indisputable that the state has a substantial interest in protecting citizens from the dangers posed by sex offenders deemed to be at high risk of re-offense. The state has an additional interest in expediting the risk level assessment and judicial review processes. The latter interest is rather self-evident: a convicted sex offender's information will not be released until an administrative determination has been made and further, when it is opted for, subsequent judicial review has been conducted; in the interim, a sex offender may be at large without there being the community notification that the General Assembly has deemed desirable. Providing limited process at the board of review level and then an opportunity for notice and a hearing for purposes of judicial review before the Superior Court strikes an appropriate balance between the liberty interests of those required to register as sex offenders and the legitimate social, administrative, and financial interests of the state.

### B

### Substantive Due Process As Applied

Mr. Germane's substantive due process claim is two-pronged. He first asserts that the Sexual Offender Registration and Community Notification Act burdens certain fundamental rights (namely, the liberty interest discussed in the preceding procedural due process section of this opinion). Moreover, he contends that the act is "wholly irrational" as applied to the facts of his case due to the nature of the *prima facie* case to be established by the state before the Superior Court for purposes of judicial review by that court.[36]

This Court has clearly articulated the analytical approach that we employ in dealing with substantive due process claims. That approach was recently summarized in the case of *Riley v. Rhode Island Department of Environmental Management* 941 A.2d 198 (R.I.2008), as follows:

"The threshold question that must be addressed before we can determine the constitutionality of the statute is whether a fundamental right is in play. If so, in that case the statute will be subject to strict scrutiny; however, where neither a suspect class nor a fundamental right is implicated, then the legislation properly is analyzed under a minimal-scrutiny test. Under those circumstances, this Court will review the statute to insure that a rational relationship exists between the provisions of [the statute] and a legitimate state interest. Under this analysis, if we can conceive of any reasonable basis to justify the classification, we will uphold the statute as constitutional." *Id.* at 205–06 (internal quotation marks omitted).

### 1. Does the Sexual Offender Registration and Community Notification Act Impermissibly Burden a Fundamental Right as Applied to Appellant?

██ Mr. Germane first argues that, as applied in his case, chapter 37.1 of title 11

---

**36.** In short, Mr. Germane argues that, in a case such as his own, in which the result yielded by the STATIC–99 does not directly correlate with the risk level actually assigned by the board of review, the *prima facie* case to be established by the state for the purposes of judicial review is irrational and wholly unrelated to the correctness (*vel non*) of the board's risk level classification.

impermissibly burdens certain of his fundamental rights that are protected by the due process clauses of the state and federal constitutions. We consider this contention to be without merit.

■■■■■ The due process clause of the federal constitution [37] (and the parallel provision of our state constitution [38]) "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The jurisprudence of substantive due process recognizes that there are certain rights so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Such rights are more fundamental and profound than the several liberty interests that have been deemed sufficient to trigger the requirements of procedural due process. Consequently, the fundamental rights protected by substantive due process are substantially shielded from adverse state actions regardless of the procedures used by the state. *See Glucksberg*, 521 U.S. at 721, 117 S.Ct. 2302.

The United States Supreme Court has recognized that the above-referenced fundamental rights include those guaranteed by the Bill of Rights as well as certain liberty and privacy interests implicit in the due process clause and in the penumbra of constitutional rights. *See Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2302. These special liberty interests have been held to include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* (citations omitted). At the same time, it should be borne in mind that the United States Supreme Court has indicated that it is reluctant to expand the doctrine of substantive due process by recognizing new fundamental rights. *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ("[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended"). This Court is similarly reluctant to recognize heretofore unarticulated fundamental rights.

In order to prevail on the substantive due process prong of his constitutional argument, appellant was required to identify a fundamental right which is "objectively, deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 720–21, 117 S.Ct. 2302 (internal quotation marks omitted).[39] The record in this case is significantly devoid of a "careful description" by appellant of any *fundamental* liberty interest of his that was allegedly violated. *See id.* at 721, 117 S.Ct. 2302 (holding that individuals asserting a substantive due process claim must set forth "a careful description of the asserted fundamental liberty interest") (internal quotation marks omitted). Furthermore, we are not convinced that persons who have been convicted of serious sex offenses have a fundamental right to be free from

**37.** U.S. Const. Amend. XIV, sec. 1 ("No state shall * * * deprive any person of life, liberty, or property, without due process of law * * *.").

**38.** R.I. Const. art. 1, sec. 2 ("No person shall be deprived of life, liberty or property without due process of law * * *.").

**39.** As previously noted, the liberty rights protected under substantive due process are more intrinsically fundamental than those several liberty interests that trigger the protection of procedural due process.

the registration and notification require-ments set forth in the Sexual Offender Registration and Community Notification Act, even if those requirements are intru-sive and remain in place indefinitely.[40]

Because the act does not constrain ap-pellant's liberty in a manner that impli-cates a fundamental right, this Court's role at this juncture is simply to determine whether "a rational relationship exists be-tween the provisions of [the statute] and a legitimate state interest." *State v. Garvin,* 945 A.2d 821, 824 (R.I.2008) (internal quo-tation marks omitted). This standard sets a rather low bar for constitutionality, and appellant "bears the substantial burden of demonstrating that no rational relationship exists between [the statute] and some le-gitimate state interest." *Id.* Mr. Germane has not carried this burden.

### 2. Are the Challenged Provisions of the Sexual Offender Registration and Community Notification Act Arbitrary or Capricious?

 In addition to protecting cer-tain fundamental rights, the substantive due process doctrine also "guards against arbitrary and capricious government ac-tion." *Brunelle v. Town of South Kings-town,* 700 A.2d 1075, 1084 (R.I.1997) (inter-nal quotation marks omitted). As we have previously stated, "[t]o make out a viola-tion of substantive due process, [challeng-ers] must establish that the challenged provisions are clearly arbitrary and unrea-sonable, having no substantial relation to the public health, safety, morals, or gener-al welfare." *Kaveny v. Town of Cumber-*

*land Zoning Board of Review,* 875 A.2d 1, 10 (R.I.2005) (internal quotation marks omitted); see also *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 31–32 (1st Cir. 1991) ("[S]ubstantive due process prevents governmental power from being used for purposes of oppression, or abuse of gov-ernment power that shocks the conscience, or action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests") (internal quotation marks omitted). Thus, the burden is on the chal-lenging party to establish that a given statute or adverse state action violates the party's right to substantive due process.

 Section 1137.1–16(b) provides that the state may make out a *prima facie* case with respect to the reasonableness of the board of review's risk assessment by dem-onstrating (1) that the board of review used a validated risk assessment tool to determine an individual offender's risk of re-offense and (2) that it used reasonable means to collect the information assessed by that tool. The appellant challenges the board of review's use of the STATIC–99, (as opposed to another risk assessment tool) and the magistrate's taking of judicial notice that the STATIC–99 as a validated instrument. He argues in his brief that the STATIC–99 "measures only a portion of the spectrum of characteristics relevant to a determination of offender dangerous-ness." On the basis of that observation, he contends that, by giving substantial weight to the use of such a risk assessment instru-ment, the General Assembly statutorily created an irrational form of mandatory presumption. Additionally, appellant con-

---

**40.** In so holding, we note that our research has not unearthed a single appellate opinion from another jurisdiction holding that sexual offender registration statutes implicate a fun-damental right for the purposes of substantive due process analysis. Every published opin-ion of which we are aware has reached the same conclusion as we have. *See, e.g., Doe v.*

*Michigan Department of State Police,* 490 F.3d 491, 500–01 (6th Cir.2007); *Doe v. Moore,* 410 F.3d 1337, 1344–45 (11th Cir.2005); *Doe v. Miller,* 405 F.3d 700, 709–10 (8th Cir. 2005); *People v. Cornelius,* 213 Ill.2d 178, 290 Ill.Dec. 237, 821 N.E.2d 288, 304 (2004); *McCabe v. Commonwealth,* 274 Va. 558, 650 S.E.2d 508, 512–13 (2007).

tends that allowing the state to rely on the STATIC–99 in making out a *prima facie* case is wholly irrational as applied in his case because his risk level as measured using the STATIC–99 did not conform to the board of review's determination of his risk level for purposes of community notification.[41]

As discussed at greater length in the next section of this opinion, the board of review is required, pursuant to its own guidelines, to review a number of case-specific facts *in addition to* an individual offender's score on the STATIC–99. While it may be used as a predictive tool in individual cases, the STATIC–99 was not designed to encompass every factor pertinent to a determination of future dangerousness. In fact, in the introduction to the STATIC–99 Coding Rules, the creators of the instrument note as follows:

> "The STATIC–99 utilizes only static (unchangeable) factors that have been seen in the literature to correlate with sexual reconviction in adult males. The estimates of sexual and violent recidivism produced by the STATIC–99 can be thought of as a *baseline* of risk for violent and sexual reconviction.
>
> " * * *
>
> "The strengths of the STATIC–99 are that it uses risk factors that have been empirically shown to be associated with sexual recidivism and the STATIC–99 gives explicit rules for combining these factors into a total risk score. * * * The weaknesses of the STATIC–99 are that it demonstrates only moderate predictive accuracy * * * and that it does not include all the factors that might be

included in a wide-ranging risk assessment.

" * * *

"[A] prudent evaluator will always consider other external factors that may influence risk in either direction." (Emphasis added.)

In Mr. Germane's case, the board of review considered both the static factors measured by the instrument and also a variety of additional dynamic factors set forth in the Parole Board Guidelines. This approach was not only reasonable, but it was also in accordance with the express recommendation of the STATIC–99's creators, who stated that "a prudent evaluator will always consider other external factors that may influence risk in either direction." According to the board of review's report and supplemental report, the additional dynamic factors which the board considered were the predicate for the conclusion that appellant posed a greater risk than indicated by his STATIC–99 score alone. We can find nothing clearly arbitrary or capricious in such reasoning; furthermore, the board of review's ability to consider dynamic factors beyond the static factors analyzed by the STATIC–99 and to adjust its conclusion as to an individual's future dangerousness on account of those dynamic factors, has a "substantial relation to the public health, safety, morals, or general welfare." *Kaveny*, 875 A.2d at 10 (internal quotation marks omitted).

■■■ As to appellant's suggestion that the Sexual Offender Registration and Community Notification Act creates an impermissible "form of mandatory presumption," we also find this argument unpersuasive.[42] (For a more extensive discussion of

---

**41.** It will be recalled that the STATIC–99 performed by the board of review scored Mr. Germane as a 2 (low-moderate risk of reoffense), yet the board ultimately classified appellant as Risk Level III (high risk of reoffense).

**42.** As a general matter, we note that legislatively mandated, rebuttable evidentiary pre-

the constitutionality of the burden shifting scheme set forth in § 11–37.1–6, *see* Section III, *infra,* discussing separation of powers).

## II

### Adequacy of the Board of Review's Record and Conformity with Statute and Guidelines

Section 11–37.1–16(c) requires the Superior Court to affirm the board of review's proposed risk assessment classification unless it is "persuaded by a preponderance of the evidence that the determination on either the level of notification [or] the manner in which it is proposed to be accomplished is not in compliance with this chapter or the guidelines adopted pursuant to this chapter." Mr. Germane contends that the Superior Court committed clear error in concluding that he failed to establish that the board of review's Level III offender designation was erroneous by a preponderance of the evidence.

The appellant premises his challenges on two grounds. First, he argues that the board of review failed to comply with its own guidelines in performing its risk assessment in his case. He further contends that the board of review and the reviewing magistrate both "overlooked and misconceived relevant evidence while simultaneously crediting unsworn double hearsay which had been explicitly repudiated by the prosecutor who originally handled [appellant's] case." Although certain aspects of Mr. Germane's argument have prompt-

ed us to reflect at length, at the end of the day we have become convinced that the decision of the Superior Court should be affirmed.

## A

### The Board of Review's Compliance with Regulations

Section 11–37.1–6(1)(b) provides as follows:

> "[T]he sex offender board of review will utilize a validated risk assessment instrument and other material approved by the parole board to determine the level of risk an offender poses to the community and to assist the sentencing court in determining if that person is a sexually violent predator."

Pursuant to the statute, the Rhode Island Parole Board Sex Offender Community Notification Unit promulgated the "Sexual Offender Community Notification Guidelines."

These guidelines govern the board of review's sex offender risk assessment procédures. Addendum 1 to the guidelines (entitled "Sex Offender Risk of Re–Offense Assessment Factors") reads as follows:

> "Each risk of re-offense assessment decision shall be made on the basis of the facts of each individual case, after review of appropriate documentation. The following fifteen (15) facts will be considered in each risk level determination. The factors listed below should be con-

---

sumptions are permissible so long as there is a rational nexus between the fact to be proved and the fact to be presumed. That fundamental principle was cogently expressed almost a century ago by the United States Supreme Court in the case of *Mobile, Jackson, & Kansas City Railroad Co. v. Turnipseed,* 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78 (1910):

"That a legislative presumption of one fact from evidence of another may not consti-

tute a denial of due process of law or a denial of the equal protection of the law, it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." *Id.* at 43, 31 S.Ct. 136; *see also State v. Ventre,* 910 A.2d 190, 198 n. 5 (R.I.2006).

sidered in conjunction with those facts that have already been articulated in RI General Laws § 11–37.1–1." [13]

This language clearly requires the board of review to consider each of the listed factors "in each risk level determination."

The board of review did not provide the Superior Court with any documentation specifically and explicitly substantiating the state's assertion that the board considered each of the factors listed in the guidelines in the course of conducting appellant's risk assessment. In its report and supplementary attachment, the board of review stated that, in performing its risk assessment, it "considered available [documents], including criminal record, police, institutional, probation/parole supervision, and treatment information." The state contends before us that these documents encompassed "most, if not all, of the Guideline factors."

Although we may fairly say that the board of review's elucidation of its analysis of the listed factors was lacking, a careful reading of the record reveals that the board of review did, at a basic level, consider all the factors required by the guidelines in assessing appellant's risk of re-offense. The board of review had access to a number of relevant documents including: (1) memoranda from appellant's probation supervisors (including information about his family relationships, his employ-

ment status, and his compliance with the terms of his probation); (2) his therapist's evaluation of appellant's progress in counseling; (3) the May 2000 report of the Board of Review of Sexually Violent Predators; (4) Dr. Wincze's 1999 psychological assessment of appellant; (5) Dr. Seghorn's 1999 psychological and sexual assessment of appellant; and (6) criminal docket sheets, witness statements, and other documents relating to the 1998 sexual assaults. We are satisfied that, as a whole, these documents address each of the factors enumerated in the guidelines.

We do note, however, that the opacity and brevity of the board of review's report almost certainly rendered judicial review of its assessment significantly more complicated than was necessary or desirable. Although the board of review used a validated risk assessment instrument (*viz.*, the STATIC–99) to determine Mr. Germane's risk for future offenses, it found that the results yielded by that instrument "under-represented" the likelihood that appellant would recidivate. *See* Sex Offender Board of Review Risk Assessment Report dated March 2, 2005. The board of review supplemented its report on June 1, 2005 with a one page attachment *briefly* elaborating its reasons for assigning appellant a higher risk level than that predicted by the STATIC–99. In that document, the board of review makes several ambiguous state-

---

**43.** It should be noted that, although the addendum states that fifteen facts are to be "considered in each risk level determination," the document actually lists only fourteen facts. The facts listed are as follows: (1) "Degree of violence" of the underlying offense; (2) "Other significant crime considerations * * * Including, but not limited to, presence of multiple offenders, animal abuse, photography/videotaping of crime, humiliation;" (3) "Degree of sexual intrusion;" (4) "Victim selection characteristics;" (5) "Known nature and history of sexual aggression;" (6) "Other criminal history;" (7)

"Substance abuse history;" (8) "Presence of psychosis, mental retardation or behavioral disorder;" (9) "Degree of family support of offender accountability and safety;" (10) "Personal, employment and educational stability;" (11) "Incarceration community supervision record;" (12) "External controls;" (13) "Participation in sex offender specific treatment program;" (14) "Response to sex offender specific treatment/admission of guilt, acceptance of responsibility for crimes, commitment to ongoing safety, recovery and sex offender treatment."

ments of fact regarding his offenses. Both reports are largely conclusory and offer little insight into the board of review's decision-making process (a deficiency which is particularly troubling in this case given the discrepancy between appellant's STATIC–99 risk assessment and the risk level ultimately assigned by the board of review).

■ There are numerous practical reasons why basic fact-finding by the board of review should be thoroughly and transparently documented in any report transmitted to the Superior Court. We have previously explained why administrative bodies should be meticulous about documenting the fact-finding process that underlies their decisions. For example, in *Hooper v. Goldstein*, 104 R.I. 32, 241 A.2d 809 (1968), we wrote as follows:

> "The reasons [for documenting the fact finding process] have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction." *Id.* at 44, 241 A.2d at 815 (quoting 2 Davis, *Administrative Law Treatise*, § 16.05 at 444) (1958).[44]

We would add that another benefit of a meticulous fact-finding process is that it permits meaningful public scrutiny of the actions of government. *See, e.g., Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978); *Cox Broadcasting Corp.*

*v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

Each of the foregoing considerations is applicable in the context of the registration and community notification process. It is profoundly to be hoped that, in the future, the board of review will better conform its practices to these sagacious principles underlying our administrative system.

■ A procedure whereby the reviewing courts can with relative speed and ease determine whether or not the board of review complied with the guidelines should be a desideratum of the highest order. Thorough and detailed documentation of the board of review's determinations is particularly desirable in cases (like appellant's) in which the board of review's risk assessment diverges from the risk of recidivism predicted by the STATIC–99 or a similar risk assessment instrument. The board of review has discretion to adjust an individual sex-offender's risk assessment up or down depending on case-specific dynamic factors. In such cases, however, it is preferable that the board of review prepare its report so as to transparently document its assessment process, bearing in mind that any degree of opacity renders the task of judicial review far more difficult.

### B

### Correctness of the Findings of the Board of Review and the Superior Court

■ Mr. Germane further contends that the board of review and the reviewing

---

**44.** This Court is certainly not alone in recognizing the great importance of transparency and scrupulous attention to detail in the administrative process. For example, in *Geraud v. Schrader*, 531 P.2d 872 (Wyo.1975), the Supreme Court of Wyoming described one of the crucial purposes served by meticulousness in the fact-finding process as follows:

> "It is insufficient for an administrative agency to state only an ultimate fact or conclusion, but each ultimate fact or conclusion must be thoroughly explained in order for a court to determine upon what basis each ultimate fact or conclusion was reached. *The court must know why.*" *Id.* at 879 (emphasis added).

magistrate both overlooked and misconstrued evidence relevant to the determination of his risk of re-offense. Specifically, appellant alleges that the board of review failed to consider Mr. Germane's supportive family and personal relationships, his parenting skills, his lack of sexual aggression or violence, and his cognitive deficits and learning disabilities. In addition, appellant challenges several of the factors that *were* considered by the board of review as being either duplicative of factors already taken into consideration through the use of the STATIC–99 or as being poor predictors of sexual offense recidivism.

We first note that any prediction of future risk is an inherently difficult and perhaps imperfect undertaking.[45] Risk assessment is not an exact science, and a certain amount of judgment and even intuition must be exercised by both the board of review and the reviewing magistrate. On the (fairly barren) face of the board of review's report and supplementary attachment, it *is* possible to discern several of the troubling factual overgeneralizations and discrepancies of which appellant understandably complains. The board of review did *not* have before it the most up-to-date evaluations of appellant's current status. Moreover, in performing the risk assessment, the board of review considered the statement of the victim in an uncharged sexual assault allegedly committed by Mr. Germane. It also appears to have applied some of the more disturbing facts from certain of appellant's 1998 sexual assaults (*i.e.*, use of a weapon, targeting of a particularly vulnerable victim, and multiple acts against a victim in one of the criminal episodes) to all of the assaults, even though there was no evidentiary basis to support such a generalization.

The Superior Court magistrate cured these deficiencies by allowing appellant to introduce evidence challenging the board of review's findings. The magistrate noted that some of the external factors considered by the board of review militated in favor of a higher risk assessment while others appeared to be duplicative of factors already included in the STATIC–99 analysis. He allowed appellant to introduce the testimony of Dr. Carol Ball and Dr. Alan Feinstein concerning appellant's current psychological health and concerning his risk of future dangerousness. The magistrate also considered the evidence proffered by appellant at the hearing with respect to his strong family support, sexual self-regulation, and lack of antisocial traits. Finally, the magistrate heard from Mr. Germane himself.

In a thoughtful and well-reasoned decision, the magistrate found that, in light of all the evidence, the method and scope of Mr. Germane's community notification was justified. The magistrate's analysis, particularly the portion thereof concerning appellant's 2003 probation violation, presents an entirely plausible (and indeed convincing) basis for affirming the board of review's assessment. We are in agreement with the magistrate that, while Mr. Germane appears to have made admirable progress in seeking treatment and improving his general stability, his 2003 probation violation vividly demonstrated the risks associated with unanticipated disruptions in his life.[46] Numerous mental health professionals who evaluated Mr. Germane opined

---

**45.** In words that remind one of some of Yogi Berra's classic apothegms, the Danish physicist Niels Bohr once remarked: "Prediction is very difficult, especially if it's about the future."

**46.** We take special note of the fact that the magistrate found Mr. Germane's account of the 2003 probation violation "totally lacking in credibility * * *."

that he was at low risk so long as he received treatment, continued taking his prescribed medications, and maintained a stable lifestyle. There is no guarantee, however, that all these conditions will be present in the future. We are satisfied that the magistrate cured the paucity of factual development provided by the board of review so as to allay any due process concerns.[47]

### III

### Separation of Powers

 Mr. Germane further asserts that chapter 37.1 of title 11 violates the separation of powers doctrine, which doctrine is expressly set forth in article 5 of the Rhode Island Constitution. *See generally In re Request for Advisory Opinion from the House of Representatives (Coastal Resources Management Council),* 961 A.2d 930, 933–35 (R.I.2008) (discussing the separation of powers doctrine in the context of the Rhode Island Constitution).

While appellant concedes that the General Assembly may allocate the burdens of persuasion that will apply at sex-offender risk level determination hearings before the Superior Court without running afoul of article 5, he argues that the General Assembly may not lawfully define what constitutes a *prima facie* case that will satisfy the state's burden of production. The appellant argues that, by providing a statutory definition of a *prima facie* case in § 11–37.1–16(b), the General Assembly has impermissibly intruded into the judicial fact-finding process. He asserts that the Superior Court is responsible for determining whether or not the state has made a *prima facie* showing of the appro-

priateness of a given risk level classification, but is statutorily precluded from undertaking the fact-finding necessary to fulfill that charge. In effect, appellant argues that the statutory definition of a *prima facie* case creates an unconstitutional evidentiary presumption: specifically, as characterized by appellant, once the state establishes (1) that a "validated risk assessment tool has been used to determine the risk of re-offense" and (2) that "[r]easonable means have been used to collect the information used in the validated assessment tool," the board of review's risk level determination is rebuttably presumed to be correct. We consider Mr. Germane's argument on this point to be unpersuasive.

 It is true that this Court has previously noted that "a statutory provision which purported to establish the conclusive existence or non-existence of a fact susceptible of proof to the contrary would, if such contrary fact were material to the cause, * * * constitute * * * an unwarranted legislative invasion of the judicial power." *Cataldo v. Admiral Inn, Inc.,* 102 R.I. 1, 4, 227 A.2d 199, 201 (1967) (citing *Western & Atlantic R.R. v. Henderson,* 279 U.S. 639, 49 S.Ct. 445, 73 L.Ed. 884 (1929)); *see generally* 4 Wigmore, *Evidence in Trials at Common Law,* § 1353 at 716 (3d ed. 1940) ("[T]o make a rule of conclusive evidence, compulsory upon the Judiciary, is to attempt an infringement upon their exclusive province."); 9 Wigmore, *Evidence in Trials at Common Law* § 2492 at 292 (3d. ed.1940) (arguing that a conclusive presumption "has no place in the principles of Evidence * * * and should be discarded."). In other words, irrebuttable pre-

---

**47.** While we conclude that in this instance the offender suffered no actionable deprivation of his right to due process, we wish to state once again in emphatic terms that we are decidedly unimpressed by what transpired at the board of review level with respect to transparency and meticulousness of attention to the factual aspects of the case. We trust that we have sufficiently articulated this "word to the wise."

sumptions can constitute a violation of the principle of separation of powers.

When, however, there is a "natural and rational relation between the fact proved and the fact presumed" *and* the inferential process is not "purely arbitrary or wholly unreasonable," legislatively mandated presumptions will not be deemed in conflict with the separation of powers doctrine. *State v. Tutalo,* 99 R.I. 14, 19, 205 A.2d 137, 140 (1964); *see also State v. Ventre,* 910 A.2d 190, 198 n. 5 (R.I.2006); *State v. Neary,* 122 R.I. 506, 512, 409 A.2d 551, 555 (1979) (citing *Turnipseed,* 219 U.S. at 43, 31 S.Ct. 136).

On its face, the statute at issue does not appear to be an attempt by the General Assembly to intrude into the judicial realm by creating unrebuttable evidentiary presumptions or by "remov[ing] from the court's discretion the determination of admissibility of otherwise relevant evidence." *Bartlett v. Danti,* 503 A.2d 515, 517 (R.I. 1986); *see generally* Graham C. Lilly, An *Introduction to the Law of Evidence* 71–72 (3d ed.1996). The question of whether or not the risk of re-offense of an individual sexual offender has been properly determined by the board of review is left open to judicial determination on the basis of the proof offered by the sexual offender and/or the state.[48] Thus, the legislatively mandated presumption is not impermissibly "conclusive," but is rather rebuttable.

Moreover, the definition of what constitutes a *prima facie* showing by the state under § 11–37.1–16(b) is neither purely arbitrary nor wholly irrational. *See Tutalo,* 99 R.I. at 18–19, 205 A.2d at 140–41. This Court can readily conceive of a variety of reasons for which the General Assembly might have chosen to link the board of review's use of a validated risk assessment tool with the inference that the associated risk level classification by that body was appropriate.[49]

We do note that the statutorily defined *prima facie* showing is somewhat less persuasive in cases such as the one at bar, in which the board of review recommends a risk level classification that does not match the risk level predicted by a risk assessment tool. We do not believe, however, that this fact alone is sufficient to render the statutory scheme unconstitutional.

## IV

### Retroactive Application of the Requirements of the Statute

■ Mr. Germane further argues that the 1999 amendments to chapter 37.1 should not be applied to him retroactively. It was in the Spring of 1998 that appellant committed the sexual offenses with which he was later charged. He pled *nolo contendere* and was sentenced on January 6, 2000. Between the dates when the crimes were committed and the date of his sentencing, the General Assembly revised the Sexual Offender Registration and Community Notification Act so as to extend the duration of registration and to establish more onerous registration obligations for certain classes of offenders. P.L.1999, ch.

---

48. As discussed in section I *supra,* it is our unequivocal view that a sex offender must *always* be given the opportunity of participating in a meaningful evidentiary hearing before the Superior Court.

49. For example, the General Assembly may have rationally presumed that a validated risk assessment instrument developed on the basis of the study of large samples of recidivist sexual offenders could serve as a reliable starting point in the board of review's risk assessment process. In fact, the General Assembly may have presumed that the use of a validated instrument would actually *lessen* the likelihood of capricious or arbitrary risk assessments at the board of review level.

255, § 1. Under the 1999 amendments and due to the aggravated nature of his crimes, Mr. Germane would be required to register with local law enforcement for the rest of his life—as contrasted with the ten-year registration requirement under the earlier versions of the act. *Id.*

The 1996 version of the Sexual Offender Registration and Community Notification Act provided as follows: "Section 1 of this act [which corresponds to the current Sexual Offender Registration and Community Notification Act] shall take effect upon passage and shall apply to those persons who are convicted of an offense requiring registration, as defined in that section, which was committed after the effective date of this act." P.L.1996, ch. 104, § 4. The effective date of said act was July 24, 1996.

The 1999 amendments did not alter the effective date of the 1996 Act, nor did they replace that date with respect to future offenses. *See* P.L.1999, ch. 255, § 1.

This Court reviews questions of statutory interpretation *de novo. Rison v. Air Filter Systems, Inc.,* 707 A.2d 675, 678 (R.I.1998). And, when we construe a statute, we are always mindful of the well-settled principle that "when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *State v. DiCicco,* 707 A.2d 251, 253 (R.I.1998).

■ With the 1999 amendments, the General Assembly clearly intended to alter certain provisions of the Sexual Offender Registration and Community Notification Act while leaving other provisions in force.

Its intent, made manifest by the nature of the changes, was to heighten the protection of the public health and safety by imposing more onerous registration requirements on sexual offenders. In particular, the General Assembly targeted classes of offenders that it deemed to be at especially high risk for future dangerousness: sexually violent predators, persons convicted of aggravated sexual offenses, and recidivists. The clear intent of the General Assembly would not be served by holding all offenders who committed the crimes between the effective date of the 1996 Act and the 1999 amendments to a less onerous requirement—particularly in light of the fact that the plain language of the 1999 Act appears to make it applicable to all persons convicted of an offense requiring registration committed after the effective date of the 1996 Act. The appellant pled *nolo contendere* to four counts of first degree sexual assault (an aggravated sexual offense under the act), which brought him within the ambit of the act.[50] We will not construe a statute so as to frustrate the clearly expressed intent of the General Assembly. For this reason, the 1999 amendments must be deemed applicable to Mr. Germane.

**V**

**The *Ex Post Facto* Challenge**

■ While Mr. Germane concedes that the Sexual Offender Registration and Community Notification Act is not sufficiently punitive in character so as to trigger the application of the *ex post facto* clause of the federal constitution,[51] he ar-

**50.** It should also be noted that, as part of the plea colloquy, Mr. Germane confirmed that he understood that he would have to register as a sexual offender and had consulted with his attorney concerning the matter. He

knowingly pled despite his awareness of the collateral civil consequences of doing so.

**51.** U.S. Const. Art. I, sec. 10. *See generally Smith v. Doe I,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (holding that the

gues that the statute is in violation of the *state* constitutional prohibition against *ex post facto* laws. R.I. Const. art. 1, sec. 12.[52] We do not agree.

■ Our test for evaluation of *ex post facto* challenges is well established. In *Town of West Warwick v. Local 1104, International Association of Firefighters, AFL–CIO, CLC*, 745 A.2d 786 (R.I.2000), we summarized that standard as follows:

"A violation of the ex post facto clause occurs only when there is retrospective application of law that disadvantages an offender by altering the definition of criminal conduct or increasing the punishment for the crime. * * * It is black letter law that the ex post facto clause in both our state and federal constitutions only prohibit retroactive *penal* legislation." *Id.* at 788 (citing *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (internal quotation marks omitted) (emphasis in original)).

Although it follows as a consequence of a criminal conviction, sexual offender registration and notification is a *civil* regulatory process. As we recently noted in the case of *In re Richard A.*, 946 A.2d 204 (R.I. 2008):

"It is evident that the purpose of the Registration Act is not to punish the offending [individual], but rather to protect the safety and general welfare of the public. Supplying the names and addresses of sex offenders to law enforcement agencies enables the agencies

to deal more successfully with the serious problem of recidivist sex offenders. * * * [T]he proceeding remains rehabilitative, rather than punitive * * *." *Id.* at 213.

Although our opinion in *In re Richard A.* addressed the Sexual Offender Registration and Community Notification Act as it applied to juveniles, we believe that our characterization of the act in that opinion is equally accurate when applied to adult sexual offenders. As we noted in that opinion: "[T]he registration requirement does not constitute criminal punishment * * *." *Id.* We therefore hold that we are not confronted with a violation of the Rhode Island *ex post facto* clause because the registration requirement is simply part of a nonpunitive, civil regulatory scheme.[53]

**Conclusion**

In conclusion, we wish to briefly summarize the holdings of the Court in this case, and we wish also to repeat, for the benefit of bench, bar, and administrative agencies, certain observations made by this Court in the course of this opinion.

First, we have observed that § 11–37.1–15(a)(2) may be considered unconstitutional under some circumstances, insofar as it grants the Superior Court discretion to deny a sexual offender the right to a meaningful hearing as a part of judicial review of any risk level classification by the board of review. Nonetheless, the judgment of the Superior Court is affirmed in this case because the magistrate granted appellant a meaningful hearing.

Alaska Sex Offender Registration Act is not sufficiently punitive so as to render it an *ex post facto* law in violation of the federal Constitution).

**52.** "No ex post facto law, or law impairing the obligation of contracts, shall be passed." R.I. Const. art. 1, sec. 12.

**53.** In so holding, we are in accord with a number of other jurisdictions. *See, e.g., Doe v. Bredesen*, 507 F.3d 998 (6th Cir.2007); *Doe v. Miller*, 405 F.3d 700 (8th Cir.2005); *Doe v. Phillips*, 194 S.W.3d 833 (Mo.2006); *Slansky v. Nebraska State Patrol*, 268 Neb. 360, 685 N.W.2d 335 (2004); *State v. Costello*, 138 N.H. 587, 643 A.2d 531 (1994); *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995).

This case also impresses upon us the need for more extensive plea colloquies in cases involving crimes that trigger sexual offender registration and community notification. As the case at bar vividly illustrates, a brief plea colloquy that sets forth few facts can lead to substantial confusion at the board of review level. It is incumbent upon the state and the plea justice to secure a clear and unequivocal factual basis that supports the defendant's admission of guilt.

Finally, while we recognize the wisdom in the maxim that "even Homer nods," we nonetheless feel compelled to exhort the board of review to be far more meticulous in its submissions in the future. Given the gravity of the board of review's responsibilities, it should at all times strive for maximal accuracy—especially in setting forth the factual bases for its conclusions.

For the foregoing reasons, the judgment of the Superior Court is affirmed. The record in this case may be remanded to the Superior Court.