DECISION
This matter came before the Court upon a timely appeal by Amy Shaw ("Appellant" or "Ms. Shaw") of a January 20, 2010 order of the Department of Business Regulation ("DBR"), which suspended her auctioneer license for twenty days and fined her two thousand dollars.[1] In her appeal, Ms. Shaw requests this Court to reverse DBR's order. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 A Facts and Travel
This appeal arose from a DBR decision and order finding Ms. Shaw responsible for violations of DBR, Division of Commercial Licensing, Commercial Licensing Regulation 2 — Auctioneers ("CLR 2"). The underlying dispute involved a pair of boxing gloves that Frank Thibault ("Mr. Thibault") left with Kenneth Shaw ("Mr. Shaw") and Ms. Shaw, in their capacity as auctioneers, with the intention of selling them at public *Page 2 
auction. Mr. Thibault filed a complaint with DBR after he was notified that his gloves sold for eighty-five dollars.
Mr. Shaw and Ms. Shaw hold auctioneer licenses pursuant to G.L. § 5-58-1 et seq.
(Admin. Hr'g Tr. Tape 1 ("Tr. Tape 1") at 3:09-35.) Pursuant to a consent agreement, Mr. Shaw is licensed as an apprentice auctioneer, and Ms. Shaw is the licensed auctioneer who is his supervisor.Id. at 3:35. The Consent Agreement, signed by Ms. Shaw, is the document which created this apprentice/supervisor relationship. Ms. Shaw has held her auctioneer license for approximately five years, and Mr. Shaw acted as her apprentice for about two years. (Admin. Hr'g Tr. Tape 3 ("Tr. Tape 3") at 0:13.)
Mr. Shaw and Ms. Shaw work at Barrington Antique and Auction, where Mr. Thibault contacted with the intention of selling his gloves in February 2008. Mr. Thibault believed that his gloves were autographed by Rocky Marciano and were worth at least six hundred dollars, as he had a previous offer for that amount. (Mr. Thibault's Ex. 1, Auctioneer Comp. Form ("Thibault Ex. 1.")) Mr. Thibault and Mr. Shaw then met and discussed the possible auction of the gloves. Mr. Thibault contends that during this meeting, Mr. Shaw told him that he would auction the gloves in April and expected to receive between $2000 and $3000 for them. Id. Subsequently, Mr. Thibault and Mr. Shaw executed a consignment control agreement which stated in pertinent part:
 "I commission you to sell the items listed above to the highest bidder by public auction. . . . I agree to hold harmless the auctioneer against any claims of the nature referred to in the agreement. Retractions of items by consignors may be subject to a fee for time/research invested. We reserve the right to place an item in the venue we deem best suited for that particular item." (Appellee's Ex. 2., Consignment Control Agreement.) *Page 3 
This agreement gave Mr. Shaw a twenty percent commission and was signed by both Mr. Thibault and Mr. Shaw. Id. Neither a date nor a minimum price appears on this agreement. Id.
At the hearing, Mr. Shaw testified that he believed he had a discussion with Mr. Thibault concerning the explanation of a reserve price, as a minimum price at which an item is to be sold. ((Admin. Hr'g Tr. Tape 2 ("Tr. Tape 2") at 32:50.) Upon clarification, he testified that he told Mr. Thibault that he would not reserve the gloves; he said "if they are authentic, they're going to take care of themselves." Id. at 33:30. He then stated that he "believes he did" explain that a reserve is a minimum price. Id. at 33:41. He further testified that he "figured in [his] head that six hundred dollars was probably a fair place to put a reserve at," but then that he "didn't even know if [he] said that to him" because "in his head he thought if [Mr. Thibault] can get six hundred dollars [he] can probably get that too."Id. at 34:17. After this testimony, Mr. Shaw then conceded that he cannot remember if he, in fact, explained the reserve price.Id. at 34:37. He later testified, however, that the two never discussed how low the potential price for the gloves could become.Id. at 38:15. Mr. Shaw and Ms. Shaw responded that when the bidding became as low as fifty dollars in the first auction, [2]
they passed the gloves "realizing that the consignor would not be happy with $20 or $30." (Appellee's Ex. 1, Response to Mr. Thibault's Comp.)
After this April auction, Mr. Thibault contends that Mr. Shaw notified him that a buyer offered $1200 for the gloves. (Thibault Ex. 1.) This buyer, however, never bought the gloves. Ms. Shaw testified that Mr. Shaw had difficulty selling the gloves because no *Page 4 
certificate or writing as to its authenticity existed with the gloves. (Tr. Tape 2 at 19:05.) Ms. Shaw further testified that she told Mr. Shaw to return the gloves to Mr. Thibault, as they were not selling. Id. at 19:25. When the Hearing Officer attempted to clarify the level of Ms. Shaw's supervision of Mr. Shaw, Ms. Shaw stated that Mr. Shaw did not need to keep records because he had a good memory and also that she did not supervise him "a whole lot."Id. at 1:16.
Mr. Shaw testified, however, that he could not return the gloves because he did not have an accurate address for Mr. Thibault as a result of Mr. Thibault's moving process. Id. Mr. Shaw further testified that at the end of every conversation he had with Mr. Thibault, he offered to return the gloves, but Mr. Thibault testified that that "there was never a point in time" in which Mr. Thibault requested the gloves back; instead, Mr. Shaw testified, Mr. Thibault insisted that Mr. Shaw "keep trying."Id. at 24:53. Mr. Shaw excused any communication problems between himself and Mr. Thibault to the fact that auctions are hectic and busy.
The gloves went to auction a second time on August 18, 2008.Id. at 20; Ex. 7, "Follow-up to Hearing" materials from Amy Shaw and Kenneth Shaw.) At this auction, the gloves sold for twenty-five dollars. (Ex. 1; Ex. 7.) Ms. Shaw testified that she received the check for all of the items sold at the auction, including Mr. Thibault's gloves, two weeks following the August auction. Id. at 45:49. She then confirmed that they waited a month and a half to send the check to Mr. Thibault. The check that Ms. Shaw and Mr. Shaw mailed to Mr. Thibault was for eighty-five dollars, despite the sale of the gloves for twenty-five dollars. *Page 5 
At the end of the hearing, the Hearing Officer declared that she would leave the record open for a week to receive any other evidence, such as advertisements for the auctions. (Tr. Tape 4 at 0:09.) She then stated that she would provide each party with any evidence she receives. Id. Mr. Shaw and Ms. Shaw submitted advertisements made prior to auction for the gloves.
The Hearing Officer issued her decision on January 19, 2010. As a preliminary matter, she found that § 5-58-8 permits DBR, after a hearing, to suspend or revoke a license, when it is shown that the licensee has engaged in certain conduct prohibited by the statute. (DBR Decision, Jan. 19, 2010 "Decision" at 10.) She further found that section to provide that DBR may assess an administrative penalty not exceeding $1000 for any violation under the chapter or of other rules and regulations. Id.
The Hearing Officer first analyzed the alleged violation of CLR 2 § 9(a)(5), which she found allows DBR to suspend or revoke a license upon proof of "bad faith, dishonesty, incompetence, or untruthfulness." (Decision at 10.) The Hearing Officer noted that CLR 2 did not define these terms; therefore, she employed theBlack's Law Dictionary definition of bad faith, dishonesty, incompetency, and untruthfulness. Id. She also explained that the fiduciary relationship existing between auctioneers and consignors must be based on truthfulness and complete disclosure because the auctioneer often is selling personal property when the consignor is not present to observe. Id. at 11. Therefore, she found that the Hearing Officer must examine the totality of the circumstances surrounding the fiduciary relationship. Id.
The Hearing Officer then found that Mr. Thibault's complaint and Mr. and Ms. Shaw's response tell "two very different versions of the events that transpired during the *Page 6 
sale of the gloves in question." Id. She found that Mr. Thibault's version stated that when the gloves failed to sell at the first auction and the subsequent buyer never bought them, he requested that the gloves be returned, but instead they were sold without his knowledge for a price below the offers conveyed and expected. Id. In contrast, the Hearing Officer found that Mr. Shaw and Ms. Shaw's version alleges that Mr. Thibault repeatedly informed Mr. Shaw and Ms. Shaw that he needed money and that the gloves had to be sold, and specifically authorized the gloves to be sold at the Cornerstone Galleries Auction.Id.
The Hearing Officer found another inconsistency in the version of events within the explanation of the reserve process. Id. The Hearing Officer explained that while Mr. Shaw and Ms. Shaw claim to have explained the no reserve process and received an indication from Mr. Thibault of his understanding, Mr. Shaw testified that he, in fact, has no recollection of actually explaining this process to Mr. Thibault. Id. at 11-12.
After presenting the contrasting versions of events, the Hearing Officer assessed Mr. Thibault's claims, beginning with that of incompetency. She found that "[a]lthough proof of termination . . . was not presented at hearing, the balance of the evidence presented is sufficient to indicate incompetency on part of the Respondents."Id. Specifically, the Hearing Officer found that the uncertainty of the intent of Mr. Thibault in selling this property at the second auction represents incompetence on the part of both Mr. Shaw and Ms. Shaw, because they had a duty to return the gloves to him, "since they understood that the Complainant did not want to sell the gloves for a price significantly less than the $600 he had previously rejected."Id. Therefore, she explained that the allegation that the consignment relationship existed after Mr. Thibault terminated it, *Page 7 
despite any lack of proof, "demonstrates incompetency, dishonesty, and/or bad faith if proven to be true." Id. at 12.
She found that it is incompetent to advise a consignor of an item's high value, to assure a high price if sold, and then merely mention a reserve term in passing to an unsophisticated consignor.Id. at 13. Moreover, the Hearing Officer explained that "[a]n auctioneer is not liable for an estimated value . . .; however when placing a high value on an item, if the item does not sell and the sale format is subsequently stripped of a reserve price, there should be evidence that the consignor actually intended to proceed sans reserve." Id. She found that there was no such evidence in this case because of the unnecessary confusion and Mr. Shaw and Ms. Shaw's omissions in explaining the reserve pricing option.Id. Specifically, she noted that it is incompetent to "assure a consumer that an item is worth between $2,000 to $3,000, know that a prior offer of $600 had been rejected, and an offer of $1,200 had recently been received, and then rationalize that a sale of that item for $25 would be acceptable to that consumer (while confirming the consignees' understanding in writing that the `consignor would not be happy with $20 or $30')." Id. She also found that the sale price confusion and the lack of confirming documentation regarding the consignment underscore Mr. Shaw and Ms. Shaw's failure to "attend carefully to details and their lack of professionalism." Id. at 14.
The Hearing Officer, therefore, concluded that the evidence at the hearing was sufficient for a finding that Mr. Shaw and Ms. Shaw were incompetent in their dealing with Mr. Thibault. Id. She emphasized the confusion that was created by "Respondents' failure to effectively communicate with the Complainant and completely understand their *Page 8 
role" and the unreasonableness of selling the gloves at twenty-five dollars given the totality of the facts. Id.
The Hearing Officer then analyzed the alleged "dishonesty" and found that the contradictions in Mr. Shaw and Ms. Shaw's own verbal and written testimony not only affected their credibility, but also warranted a serious consideration if dishonesty exists. She then outlined five instances within the testimony in which contradictions demonstrate dishonesty in performing the licensed duties.Id. at 15-17. According to the Hearing Officer, these contradictions included the following: Mr. Shaw and Ms. Shaw's statements regarding any explanation of the reserve or minimum price option; Mr. and Ms. Shaw's written presentations regarding the $1200 offer — one statement that states that the offer was discussed and one that states it was never discussed; the dispute over each party's understanding as to whether the gloves should be returned; Mr. and Ms. Shaw's understanding of the price of the gloves: that the gloves did not sell for eighty-five dollars, but they issued a check for that amount when the check should have been for $18.75; Mr. and Ms. Shaw's selective submission of phone records and parties' dispute over the length of conversations.Id. at 15-16.
The Hearing Officer then analyzed the other statutory provision implicated in the matter, CLR 2 § 6(a).[3] She stated that although that provision was not argued by Mr. Thibault, it has nonetheless been implicated through both the admissions of Mr. Shaw *Page 9 
and Ms. Shaw, as well as by the evidence and testimony adduced at the Hearing. Id. at 17. She further stated that Mr. Thibault
 "is a pro se litigant and not a licensee of this Department, and as such is under no burden to know the law, rather a pro se litigant oftentimes only knows that they are aggrieved and should seek redress. The Respondents, however, are licensees and are under a burden to know the laws and regulations relevant to their profession." Id.
She explained that CLR 2 § 6(a) requires that a licensee must remit payment to consignors of goods sold within thirty days of the disposition of the consigned property, unless a written agreement between the two parties states to the contrary. Id. She found that in this case, by Mr. Shaw and Ms. Shaw's admissions, the gloves were sold in August, and payment was not remitted until October and that there was no agreement authorizing this delay. Id.
Mr. Shaw had been in contact with Mr. Thibault via telephone and thus, despite allegedly not having his address, he was in contact with him and could have delivered the check. Id. Therefore, the Hearing Officer found that the testimony and exhibits establish that they violated CLR 2 § 6(a). Id.
The Hearing Officer further found that Ms. Shaw testified that she supported Mr. Shaw's actions between Mr. Shaw and Mr. Thibault and acted as Mr. Shaw's supervisor. She determined that "[i]t is clear from the record that Amy Shaw did not properly supervise the communications and interaction between Mr. Shaw and the Complainant." Id. at 19. The Hearing Officer explained that by telling Mr. Shaw to return the gloves, Ms. Shaw could expect that Mr. Thibault would have an expectation of having the gloves returned. Id. Therefore, according to the Hearing Officer, Ms. Shaw should have followed through with her supervisory duties in finding out why the gloves were not returned. Id. Accordingly, the Hearing Officer found that based on those facts, Ms. *Page 10 
Shaw's failure to properly supervise Mr. Shaw supports a finding of incompetency under CLR 2 § 9(a)(5).[4] Id. at 19.
The Hearing Officer then continued to explain the rationale for the penalties imposed. Id. at 20. She found that the violations of CLR 2 §§ 6(a) and 9(a)(5) by Ms. Shaw, were accompanied by the inconsistent and contradictory testimony. She found that while mere incompetence may be explained and attributed to other factors, "the element of dishonesty indicates an intentional behavior that is more difficult to explain and, for this agency's purposes, regulate." Id. Therefore, the Hearing Officer determined that she must impose a penalty that fits the seriousness of the violations. Id. Thus, she found that given this seriousness, the maximum monetary penalty allowed by the regulations is not sufficient. Id. Accordingly, she recommended that Ms. Shaw's license be suspended for thirty days and Mr. Shaw's permit be suspended for sixty days. Id. She additionally recommended that each Respondent pay $1000 per violation.Id. As Ms. Shaw was found liable for two violations, Ms. Shaw was required to pay a penalty of $2000.
The Hearing Officer elaborated that she recommended a shorter suspension for Ms. Shaw because she had limited direct contact with Mr. Thibault. Nevertheless, the Hearing Officer explained that Ms. Shaw's failure to supervise Mr. Shaw demonstrated her incompetence and warranted suspension beyond a monetary penalty.Id. at 21. *Page 11 
The Hearing Officer produced her decision on January 19, 2010. On January 20, 2010, Michael Marques, the Director of DBR at that time, adopted her decision. On January 26, 2010, Ms. Shaw filed a timely appeal to this Court.
In this appeal, Ms. Shaw argues that DBR's decision violated the substantive due process clause because CLR 2 § 9 does not state that a Supervising Auctioneer's license may be suspended on the basis of misconduct by an apprentice. She further avers that the penalties imposed are arbitrary and capricious, because the only contribution that Ms. Shaw made to Mr. Shaw's relationship with Mr. Thibault was rendering the advice to Mr. Shaw to return the gloves. Furthermore, Ms. Shaw asserts that the DBR decision violates notice requirements because Ms. Shaw was not notified of any allegation involving the consent agreement, which was her agreement to supervise Mr. Shaw. Ms. Shaw also argues that the decision was tainted by error due to the bias of the Hearing Officer because according to Ms. Shaw, the Hearing Officer neither required Mr. Thibault to present his own case nor reviewed the evidence with objectivity.
In response, DBR maintains that Ms. Shaw was afforded all due process rights because she received notice and a hearing. Moreover, DBR avers that a supervising auctioneer is responsible for the acts of his or her apprentice under CLR 2 § 3(s).[5] DBR asserts that the penalties imposed were not arbitrary or capricious because they were based on the record evidence. Additionally, DBR contends that the consideration of the Consent Agreement did not serve as a violation of statutory procedure. Additionally, DBR argues that both Mr. Thibault and Ms. Shaw contributed to the finding of liability *Page 12 
for a violation of CLR 2 § 6(a) and that DBR would be remiss in ignoring the evidence submitted for its consideration. Lastly, DBR maintains that the Hearing Officer's conclusions were supported by reliable, probative and substantial evidence on the whole record.
 II Standard of Review
This Court's review of contested administrative decisions is governed by the Rhode Island Administrative Procedures Act. G.L. 1956 § 42-35-15. This section provides:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Sec. 42-35-15(g).
Under this section, the Court may not substitute its judgment for that of the agency with respect to the credibility of witnesses or the weight of evidence concerning questions of fact. InterstateNavigation Co. v. Division of Pub. Utils. Carriers.,824 A.2d 1282, 1286 (R.I. 2003) (citing Rocha v. StatePub. Utils. Comm'n, 694 A.2d 722, 725 (R.I. 1997)). As such, "if `competent evidence exists in the record, the Superior Court is *Page 13 
required to uphold the agency's conclusions.'" Auto Body Ass'nof R.I. v. Rhode Island Dep't of Bus. Regulation,996 A.2d 91, 95 (R.I. 2010) (quoting Rhode Island Pub.Telecommunications Auth. v. Rhode Island State Labor RelationsBd., 650 A.2d 479, 485 (R.I. 1994)). Competent or substantial evidence is "`some or any evidence supporting the agency's findings.'" Id. (quoting Environmental ScientificCorp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993)). This Court, however, conducts a de novo review of conclusions of law.Arnold v. Rhode Island Dep't of Labor Training Bd. ofReview, 822 A.2d 164, 167 (R.I. 2003) (citing JohnstonAmbulatory Surgical Assocs. v. Nolan,755 A.2d 799, 805 (R.I. 2000)).
 III Analysis A Due Process Violation
Appellant argues that the Hearing Officer did not stay within the bounds of CLR 2 § 9; therefore, Appellant avers that DBR's decision violated her due process rights because its interpretation "enlarges the basis for revocation beyond the specific regulatory parameters." DBR responds that DBR's decision did not violate Appellants' due process rights because she was ensured proper notice and a hearing.[6] *Page 14 
The due process clauses of the R.I. Const.[7] and U.S. Const.[8] "provide[] heightened protection against government interference with certain fundamental rights and liberty interests."State v. Germane, 971 A.2d 555, 583 (R.I. 2009) (quotingWashington v. Glucksberg, 521 U.S. 702, 720 (1997)). Appellant does not argue that any of her fundamental rights have been infringed; instead, she argues that DBR's interpretation of the statute was arbitrary and capricious because it enlarged the scope of the regulation. Therefore, she avers that DBR violated her substantive due process right because it did not act in strict conformance with a defined legislative policy when it took her property, the auctioneer license.
As opposed to procedural due process, a substantive due process claim "rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible." Rhode Island EconomicDev. Corp., 892 A.2d at 97 (quoting L.A. Ray Realty v. TownCouncil of Cumberland, 698 A.2d at 210). Thus, it prohibits government actions that are "egregiously unacceptable, outrageous, or conscience-shocking." L.A. Ray Realty,698 A.2d at 211 (quoting Jolicoeur, 653 A.2d at 751). To prove a violation of substantive due process, Appellant "must establish that the challenged provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Germane,971 A.2d at 583 (quoting Kaveny v. Town of Cumberland Zoning Bd.of Review, 875 A.2d 1, 10 (R.I. 2005)) (citing PFZ Properties,Inc., 928 F.2d at 31-32); *Page 15 see also Riley v. Rhode Island Dep't of Envt'lMgmt., 941 A.2d 198, 207 (R.I. 2008). When no fundamental right is at issue, the substantive due process doctrine nevertheless "guards against arbitrary and capricious government action."Id. (quoting Brunelle v. Town of South Kingstown,700 A.2d 1075, 1084 (R.I. 1997); Rhode IslandEcon. Dev. Corp. v. The Parking Co., L.P.,892 A.2d 87, 97 (R.I. 2006)).
In this case, the relevant regulation, CLR 2, which concerns auctioneer licensing, states that the purpose of the rules is to assist DBR in carrying out § 5-58-1 et seq. "so that the public interest may be effectively served." CLR 2 § 2. Requiring auctioneer licensees to maintain honesty in their dealings is not unreasonable means by which to protect the public interest. Thus, this regulation, whose goal is to serve the public through regulating and licensing auctioneers, is neither conscience-shocking nor egregiously unacceptable. Accordingly, the Court finds that the rules within CLR 2 do not violate substantive due process.See Kaveny, 875 A.2d at 10-11 (finding that an act creating a procedure for the approval of construction of low income housing, which stated its purpose to "assure the health, safety, and welfare of all citizens of this state" had a substantial relation to proper legislature purposes, did not attempt to reach these purposes through unreasonable means, and did not violate substantive due process).
Additionally, in her decision, the Hearing Officer thoroughly analyzed the relevant regulations. Specifically, she defined every term in CLR 2 § 9(a)(5) and applied each relevant fact to the terms. She also applied these facts to CLR 2 § 3(s), which states that a supervising auctioneer is responsible for his or her apprentice. This Court will "accord an agency's decision considerable deference when that decision involves a technical question within the field of the agency's expertise." Rhode Island Higher Educ. *Page 16 Assistance Auth. v. Dep't of Educ.,929 F.2d 844, 857 (1st Cir. 1991) (internal quotations omitted). As her thorough analysis was reasonable and supported by competent evidence in the record, DBR's decision was not arbitrary and capricious nor conscious shocking. See Germane,971 A.2d at 585. Accordingly, this Court finds no violation of the substantive due process claim.
 2 Vagueness Argument
Appellant further argues that CLR 2 § 9(a)(5) violates due process because it is not of sufficient clarity to enable an ordinary person to understand its scope and meaning. Section 9(a)(5) states the following:
 "(a) The Director may deny, non-renew, suspend or revoke the License/Permit of any Auctioneer Applicant, Licensee, Apprentice Auctioneer Applicant or Permittee for any other of the following reasons:
 ". . . .
 "(5) any conduct which demonstrates bad faith, dishonesty, incompetency, or untruthfulness."
To prove that this language is impermissibly vague, Appellant must show that the regulation cannot be understood by a person of ordinary intelligence. City of Warwick v. Apt,497 A.2d 721, 724 (R.I. 1985) (quoting State v. Picillo,105 R.I. 364, 369, 252 A.2d 191, 194 (1969)). Furthermore, the language is unconstitutional only if it is "impermissibly vague in all of its applications." State ex rel. Town of Westerly v.Bradley, 877 A.2d 601, 605 (R.I. 2005) (quoting Village ofHoffman Estates v. The Flipside, Hoffman Estates, Inc.,455 U.S. 489, 494-95 (1982)). *Page 17 
In this case, the regulation provides the standard of "bad faith, dishonesty, incompetence, or untruthfulness" by which the Director may suspend or revoke their license. Under this plain standard, licensees should understand that their license could be suspended or revoked under certain circumstances. See Kaveny,875 A.2d at 10. Contra Fitzpatrick v. Pare,568 A.2d 1012, 1013-14 (finding a statute providing for the suspension of a drivers license when a driver was involved in an accident resulting in the death or personal injury of another as unconstitutionally vague because it lacked a standard, such as wrongfulness). Based on the standard set forth in this statute, a person of average intelligence would not have "to guess and [] resort to conjecture as to its meaning and/or as its supposed mandated application." Kaveny, 875 A.2d at 10 (quotingTrembley v. City of Central Falls,480 A.2d 1359, 1365 (R.I. 1984)) (citing Bourque v. Dettore,589 A.2d 815, 822-23 (R.I. 1991)). Therefore, CLR 2 § 9(a)(5) is not unconstitutionally vague.
Relying on Bouie v. City of Columbia, Appellant further argues that statutory vagueness is caused by "loose and unforeseen interpretation." See 378 U.S. 347, 352-53 (1964). In the context of a due process violation in a criminal case, the United States Supreme Court has found that "the objection of vagueness is two-fold: inadequate guidance to the individual whose conduct is regulated, and inadequate guidance to the triers of fact. The former objection could not be cured retrospectively . . . though it might be cured for the future by an authoritative judicial gloss." Id. at 353 (quoting Freund, The Supreme Court andCivil Liberties, 4 Vand. L. Rev. 533, 541 (1951)). The Court has further explained the Bouie theory of vagueness by emphasizing that "a criminal statute must give fair warning of the conduct that it makes a crime." Rogers v. Tennessee, 532 U.S. 451, *Page 18 
457 (2001) (emphasis added) (quoting Bouie, 378 U.S. at 350);see also Rogers, 532 U.S. at 459-60 (listing the cases interpreting Bouie, all of which are criminal); State v.DeWitt, 557 A.2d 845, 848 (R.I. 1989) (interpretingBouie's "fair warning" requirement as qualifying the application of the ex post facto clause). In Rogers, the Court emphasized that Bouie was based on "core due process concepts of notice, foreseeability, and in particular, the right to fair warning as those concepts bear on the constitutionality of attachingcriminal penalties to what previously had been innocent conduct." Id. at 459 (emphasis added) (citing Bouie,378 U.S. at 351, 352).
As a result, Appellant's reliance on Bouie is misplaced. First, she is not appealing a criminal conviction, like that in Bouie and its progeny. See, e.g.,Rogers, 532 U.S. at 457; Bouie, 378 U.S. at 352-53. Second, even if Bouie applied to a license violation, CLR 2 affords "fair warning" to licensees that their license may be revoked based on conduct of their apprentice. Specifically, the regulations reflect that a supervising auctioneer is "responsible" for the acts of his or her apprentice and that a license may be suspended for any "conduct which demonstrates bad faith, dishonesty, incompetence, or untruthfulness." Thus, through CLR 2 §§ 3 and 9, a person of average intelligence is put on notice that DBR may suspend his or her license for these acts of an apprentice because a licensee is "responsible" for the acts of an apprentice. As CLR 2 provides "fair warning" to licensees, Appellant's due process claim is denied.
 B Administrative Penalties
Appellant contends that to suspend her professional license and fine her was "a grotesque abuse of authority" by the Hearing Officer and constituted arbitrary and *Page 19 
capricious penalties. DBR responds that the penalties are not arbitrary and capricious because the sanctions are based on Ms. Shaw's failure to supervise her apprentice, as required by CLR 2 § 3(a).
Reviewing courts afford administrative agencies considerable deference to the imposed penalties because they are left for the agency's special competence. Am. Jur. 2d Admin.Law. § 453; see also Broad St. Food Mkt.,Inc. v. United States, 720 F.2d 217, 220 (1st Cir. 1983) ("[W]hen Congress entrusts enforcement to an administrative agency, the choice of sanction is `peculiarly a matter for administrative competence'" (quoting Kulkin v. Bergland,626 F.2d 181, 184 (1st Cir. 1980)). Thus, a court may not review the penalty any further than whether "the agency exercised an allowable discretion or an allowable judgment in its choice of the remedy."Id. (footnote omitted). In Rhode Island, the Supreme Court has found that a reviewing justice may not decide whether the agency chose the appropriate sanction but rather, it may only determine whether the agency's finding was supported by any competent evidence. Rocha v. State Pub. Utils. Comm'n,694 A.2d 722, 726 (R.I. 1997); see also Broad St.Food Mkt., Inc., 720 F.2d at 220 ("An agency's choice of sanction is not to be overturned unless the reviewing court determines it is `unwarranted in law . . . or without justification in fact. . . .'") (omissions in original) (quoting Kulkin v. Bergland,626 F.2d 181, 184 (1st Cir. 1980)) (citing Collazo v.United States, 668 F.2d 60 (1st Cir. 1981)).
Under CLR 2 § 9, the Director may deny, non-renew, suspend or revoke the license of an auctioneer for "violation or failure to comply with any of the provisions of [the] Rules or the Act" and "any conduct which demonstrates bad faith, dishonesty, incompetency or untruthfulness." CLR 2 § 9(a)(1), (2). In her decision, the Hearing *Page 20 
Officer thoroughly explained her rationale for the imposed penalties. (Decision at 20.) Specifically, she discussed that DBR must "impose a penalty that fits the seriousness of [Appellant's] violations." Id. The Hearing Officer continued by explaining that the maximum monetary penalty under the Rules and Regulations was not sufficient given the acts and omissions; consequently, she found that Ms. Shaw's license must be suspended for thirty days and she must pay a penalty of $1000 per violation, a total of $2000.Id.
In her rationale on these penalties, the Hearing Officer further stated that she recommended a shorter suspension for Ms. Shaw than for Mr. Shaw because Ms. Shaw "had limited, if any, direct contact with the Complainant." Id. at 21. Nevertheless, she found that Ms. Shaw's "failure to supervise Mr. Shaw clearly demonstrated her incompetence especially with an existing conditional Consent Agreement and therefore warrants a suspension beyond a monetary penalty." Id. Thus, evidenced by this thorough explanation, the Hearing Officer supported the penalties with both competent evidence and logical rationale. See Rocha,694 A.2d at 726. Accordingly, this Court finds that DBR's sanctions on Ms. Shaw were not arbitrary and capricious nor characterized by an abuse of discretion.
 C Notice Required Pursuant to Section 5 of CMR 2
Appellant avers that the DBR Hearing Officer violated DBR Rules of Procedure for Administrative Hearings, CMR 2 ("CMR 2") § 5 by considering Ms. Shaw's supervision of Kenneth Shaw's compliance with a consent agreement as the basis for the suspension of Ms. Shaw's license. She specifically contends that she did not receive notice that her supervision of the Consent Agreement would be under consideration and *Page 21 
therefore, under CMR 2 § 5 and § 42-35-9(b)(4), the Hearing Officer could not consider it. DBR responds that the decision was, in fact, not based on the Consent Agreement.
In a contested agency adjudication, reasonable notice is required. Sec. 42-35-9(a). That notice must include, among other requirements, "[a] short and plain statement of the matters inserted. If the party is unable to state the matters in detail at the time notice is served, the initial notice may be limited to a statement of the issues involved and detailed statement shall be furnished." This notice requirement is intended to ensure that the party is not surprised by the nature of the hearing and can adequately prepare prior to it. Correia v. Norberg,120 R.I. 793, 801, 391 A.2d 94, 98 (1978) (citing 1 Davis,Administrative Law Treatise, § 8.05 at 530 (1958));see also Providence Gas Co. v. Burke,119 R.I. 487, 503, 380 A.2d 1334, 1342 (1977) (finding that "a party to a contested case shall receive notice which in plain terms draws attention to, among other things, the subject matter to be considered at the hearing"). Section 5 of CMR 2 requires that the "[n]otice shall be designed to afford an opportunity for a hearing to all parties pursuant to R.I. Gen. Laws § 42-35-9(a)."
In this case, Mr. Thibault filled out a DBR complaint form on February 9, 2009. (Thibault Ex. 1.) To this complaint, he attached the following: a letter to a DBR employee concerning the matter; a Better Business Bureau ("BBB") complaint; a six page letter from Mr. Thibault describing the situation to the BBB; a five page rebuttal letter from Mr. Thibault to BBB; the consignment control agreement that was sent to BBB; and the check and envelope from Barrington Antique and Auction Co. to Mr. Thibault.Id. Through these documents, Mr. Thibault provided extensive detail that the subject of the hearing was the sale of the boxing gloves. These documents, however, did *Page 22 
not explicitly mention the Consent Agreement between Mr. Shaw and Ms. Shaw. Nevertheless, knowing that she was "responsible" for Mr. Shaw's actions, Ms. Shaw had notice that she may be responsible for any action of Mr. Shaw as a result of the consent agreement.
Additionally, the Hearing Officer only considered the Consent Agreement to note on the record and in the decision that Ms. Shaw was Mr. Shaw's supervising auctioneer. (Decision at 21.) ("[H]er failure to supervise Mr. Shaw clearly demonstrated her incompetence especially with an existing conditional Consent Agreement and therefore, warrants a suspension beyond a monetary penalty."). Section 3(s) of CLR 2, instead of the Consent Agreement, was, in fact, the basis of the violation because Ms. Shaw was "responsible" for her apprentice. Id. at 19. When the Hearing Officer considered possible violations of the Consent Agreement, she was "concerned about and must necessarily refer this matter for further enforcement due to the potential violation of the Consent Agreement by both Respondents for the violations found herein and for failure to comply with the terms of the Consent Agreement."Id. at 18-19. Thus, giving Appellant an opportunity to contest the allegations involving the boxing gloves provides her with adequate time to prepare and thus was in full compliance with the statutory requirements. See Price v. State,500 A.2d 527, 529 (R.I. 1985) (finding that an administrative hearing notice that stated in pertinent part the Director of Health had reason to believe that the establishment was a sheltered care facility was valid notice under § 42-35-9). Accordingly, this Court finds that Appellant had proper notice under CMR 2 § 5 and § 42-35-9(b)(4). *Page 23 
 D Potential Bias of the Hearing Officer
Appellant additionally argues that the Hearing Officer's decision is affected by unlawful procedure because the Hearing Officer found that Mr. Thibault, as a pro se litigant, is under no burden to know the law. (Decision at 17.) She argues that this alleged advocacy of the Hearing Officer on behalf of Mr. Thibault violates CLR 2 § 5, because the Hearing Officer was not leaving the presentation of the case solely to Mr. Thibault. In response, DBR maintains that the dated and uncontroverted evidence speaks for itself, and the Hearing Officer was not improper in finding a violation of § 6(a). Appellant further argues that the Hearing Officer failed to take an objective view of the evidence. In response, DBR argues that there is competent evidence on the record to support the Decision. Specifically, it maintains that the oral testimony provides a basis for the Hearing Officer's credibility determinations.
In Rhode Island, when an administrative agency acts in a quasi-judicial function, it is obligated to remain impartial, like a judge. Champlin's Realty Assocs. v. Tikoian,989 A.2d 427, 443 (R.I. 2010) (citing Town of Richmond v.Wawaloam Reservation, Inc. 850 A.2d 924, 933 (R.I. 2004)). Thus, "administrative tribunals must not be `biased or otherwise indisposed from rendering a fair and impartial decision.'"Id. (quoting Davis v. Wood,44 A.2d 190, 192 (R.I. 1982)) (citing Marshall v. Jerrico,Inc., 446 U.S. 238, (1980)). Specifically, a hearing officer must not become an "advocate or participant" in the contested case.Id. (quoting Davis v. Wood,427 A.2d 332, 337 (R.I. 1981)).
Nevertheless, "[a]ny administrator is presumed to be neutral unless proven to be otherwise." In re Cross,617 A.2d 97, 100 (R.I. 1992) (citing Gorman v. University of *Page 24 R.I., 837 F.2d 7, 15 (1st Cir. 1988)); seealso United States v. Chem. Found.,272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (citations omitted));Champlin's Realty Assocs., 989 A.2d at 443 ("[A]djudicators in administrative agencies enjoy a `presumption of honesty and integrity.'"). This presumption may be overcome through evidence that the adjudicator has become involved in building a party's case or other circumstances which make the risk of unfairness intolerably high. Champlin's Realty Assocs.,989 A.2d at 443 (quoting Kent Cnty. Water Auth. v. State,723 A.2d 1132, 1137 (R.I. 1999)). Any alleged bias, however, must be based on "more than mere speculation and tenuous inferences."Gorman, 837 F.2d at 15 (citations omitted).
In her decision, the Hearing Officer stated that "[t]he Complainant is a pro se litigant and not a licensee of this Department, and as such is under no burden to know the law, rather a pro se litigant oftentimes only knows that they are aggrieved and should seek redress." (Decision at 17.) Although the Hearing Officer seemed to be explaining why the Complainant did not himself allege a violation of CLR 2 § 6(A), taken out of context, this portion of the Hearing Officer's decision could be construed as bias. Nevertheless, the conclusion finding bias would be based on mere speculation and tenuous inferences because it would be dependent on a mere phrase from a twenty-six page decision. Appellant emphasizes the following language in Davis:
 "But a Hearing Officer must be impartial and must not attempt to establish proof to support the position of any party to the controversy. Once he does so, he becomes an advocate or participant, thus ceasing to function as an impartial trier of fact. Such a transformation gives rise to a lack of the fundamental fairness required by due process." *Page 25 
428 A.2d at 327 (citing National Labor Relations Bd. v. Air Flow Sheet Metal, Inc., 396 F.2d 506, 508 (7th Cir. 1968); Tele-Trip Co. v. National Labor Relations Bd., 340 F.2d 575, 581 (4th Cir. 1965); Bilzard v. Frechette, 601 F.2d 1217, 1222 (1st Cir. 1979)).
In this case, the Hearing Officer did not need to "attempt to establish proof to support the position of any party to the controversy" because the parties provided the Hearing Officer with uncontested evidence of the violation. The Hearing Officer based this violation of § 6(a) on the evidenced date of the sale and the date of the check submitted by Mr. Thibault. Moreover, Ms. Shaw testified to this date during the hearing and could not provide an explanation for the delay. (Tape 2 at 45:49.) Additionally, the Hearing Officer made credibility determinations regarding each witness's testimony. Therefore, the Hearing Officer, as an adjudicator for DBR, could not simply ignore this uncontroverted evidence. As the Hearing Officer was provided with uncontroverted evidence proving a violation of this rule and the alleged violations, this Court cannot find evidence of bias within DBR's decision. See Davis, 427 A.2d at 337 (finding that questioning by the hearing officer was for clarification of the issues and therefore did not display prejudice, and that the hearing officer's subsequent appearance in Superior Court as an adversary did not prove bias at the earlier hearing).
 III Conclusion
After a review of the entire record, this Court finds that the DBR's decision was not made upon unlawful procedure; clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Substantial rights of *Page 26 
the Appellant were not prejudiced. Accordingly, this Court affirms DBR's decision and denies Ms. Shaw's appeal. Counsel shall submit an appropriate order for entry.
[1] Neither Frank Thibault nor Kenneth Shaw, both originally parties to this case, appealed DBR's order. Accordingly, the Court will omit any issues which pertain exclusively to those parties.
[2] Ms. Shaw and Mr. Shaw put Mr. Thibault's gloves up for auction on two occasions — an April 5, 2008 auction and an August 18, 2008 auction.
[3] This section provides in pertinent part:
 "Auctioneers shall pay owners or consignors of Goods sold at Auction within thirty (30) days of the conduct or such Auction sale unless the Auctioneer has entered into a written agreement with the owner or consignor specifying the method and time of partial and/or full payment for Goods sold." CLR 2 § 6(a).
[4] This section states the following:
 "(a) The Director may deny, non-renew, suspend or revoke the License/Permit of any Auctioneer Applicant, Licensee, Apprentice Auctioneer Applicant or Permittee for any other [sic] the following reasons:
 ". . .
 "(5) any conduct which demonstrates bad faith, dishonesty, incompetency or untruthfulness
 ". . ." CLR 2 § 9(a)(5).
[5] This section states that a "`Supervising Auctioneer' means a licensed Auctioneer who employs an Apprentice Auctioneer and agrees to be responsible for the acts of the Apprentice Auctioneer." CLR 2 § 3(s).
[6] The only argument Appellant provides concerning any due process violation is that "a person who holds a license to conduct an occupation has a property right to the continued possession of that license protected by the due process clause." DBR's response, however, is based on procedural due process. The Rhode Island Supreme Court has noted that "[s]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing . . . does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."Plainfield Pike Gas Convenience, LLC v. 1889 Plainfield PikeRealty Corp., 994 A.2d 54, 58 (2010) (alteration in original) (omission in original) (quoting Wilkinson v. State CrimeLaboratory Comm'n, 788 A.2d 1129, 1132 n. 1 (R.I. 2002)). Thus, this Court will not consider violations of procedural due process.
[7] This clause provides that, "[n]o person shall be deprived of life, liberty or property without due process of law." R.I. Const. Art. 1, § 2.
[8] This clause mandates that "[n]o person shall be . . . deprived of life, liberty or property without due process of law."U.S. Const. Amend. XIV. *Page 1